The opinion of the court was delivered by
Nicholls, C. J.
On the 4th of January, 1893, the defendants (Ferguson) leased to O. O. Knowles for the period of . five years commencing in January, 1893, and ending January, 1898, the Wood-burn plantation, in the parish of Tensas,-for and in consideration of a rent of three thousand dollars. The rent was represented by five notes of Knowles of six hundred dollars each, payable on or before the first day of December of the years 1893, 1894, 1895, 1896, 1897 and 1898. On the 15th day of May, 1893, the defendants (Ferguson) mortgaged certain property in the parish of Tensas to the firm of Bedford. & O’Kelley to secure an indebtedness to the latter of three thousand eight hundred and twelve dollars, represented by five promissory notes, which they executed in solido payable to their own order, one for eight hundred and twelve dollars and fifty cents, due January 1, 1894; one for eight hundred and forty dollars, •due 1st of January, 1895; one for seven hundred and eighty dollars, •due 1st January, 1896; one for seven hundred and twenty dollars and fifty cents, due 1st of January, 1897, and one for six hundred and sixty dollars, due 1st January, 1898, each note bearing interest at eight per cent, per annum after maturity, the aggregate amount Of the notes being three thousand eight hundredfand twelve dollars.
*1236 On the 4th day of May, 1893, the parties executed the following agreement:
Vicksburg, 4, 1893.
This Instrument Witnesseth: That James G. Ferguson and Kim-ball F. Ferguson, of Warren county, State of Mississippi, are indebted to Bedford & O’Kelley, composed of Thomas 0. Bedford, of the above county and State, and J. B. O’Kelley, of Tensas parish, State of Louisiana, to the amount of three thousand and eight hundred and twelve dollars and fifty-three cents, as evidenced by five promissory notes signed by the above named J. G. and Kimball F. Ferguson, described in a certain mortgage and signed by the above’ named J. G. and Kimball F. Ferguson, of the Woodburn plantation, in Tensas parish, in favor of Bedford & O’Kelley, as security for the five notes above named, and in addition to the above named mortgage, as security for the five notes above named, James G. Ferguson conveys to Bedford & O’Kelley five notes, with all rights and interest, executed and signed by O. O. Knowles, and in favor of J. G. Ferguson for six hundred dollars each, aggregating three thousand dollars, the first note due and payable on December 1, 1893, the other four notes due and payable on the 1st day of December, 1894, 1895, 1896 and 1897. Now it is distinctly understood that Bedford & O’Kelléy acknowledge the receipt of the five notes executed by 0. 0. Knowles, and in favor of James G. Ferguson, and that the said Bedford & O’Kelley agree and bind themselves to collect the said five notes receipted for and apply the proceeds, as they fall due, to the payment of the five notes Bedford & O’Kelley hold against the said J. G. and Kimball F. Ferguson and secured by mortgage on the Woodburn plantation of the said Fergusons, in Tensas parish, State of Louisiana; the five notes conveyed by James G. Ferguson a.re rent notes on the Woodburn plantation belonging to said Ferguson in Tensas parish, La., which is fully described in a lease of five years executed by James G. Ferguson to O. 0. Knowles, and as those five notes become due, Bedford & O’Kelley, as holders of said notes, agree to collect the said notes and apply the amount of said notes to the payment of the five notes Bedford & O’Kelley hold against said Fergusons as named heretofore and described in mortgage on the Woodburn plantation and in favor of Bedford & O’Kelley.
T. O. Bedford.
J. B. O’Kelley.
Knowles prior to leasing the Woodburn plantation had been cultivating several plantations in Tensas parish, Bedford & O’Kelley being his factors. Entering into possession of the Woodburn plantation, under this lease in the beginning of 1893, Knowles abandoned it in January of 1895, though at what precise date he did so the record does not show. Bedford & O’Kelley during that period continued to make him advances. The planting operations of 1893 and 1894-left Knowles heavily indebted to them. The crop of 1893 was, however, sufficient to cover the first rent note. Bedford & O’Kelley, to- *1237 whom the crop was shipped, took up the note, placing a corresponding credit on their mortgage claim against the Fergusons. In November of 1894 Bedford & O’Kelley having become discouraged at Knowles’ want of success notified him they could no longer make him advances upon Woodburn plantation. Unable to obtain them from other parties he abandoned the plantation, taking the stock, carts and farming utensils which he had been using on the place and also a lot of corn over to another plantation in the neighborhood of which he was the lessee.
The crop of 1894, of the Woodburn plantation, was shipped to Bedford & O’Kelley. They applied six hundred dollars of the proceeds to the extinguishment of Knowles’ second note (they carrying with it a corresponding credit on the Fergusons’ notes) and the balance to his indebtedness to themselves. The defendants complain of the course followed by Bedford & O’Kelley (now represented by O’Kelley). They charge that the firm was aware early in November of Knowles’ intention of abandoning the plantation and failed to give defendants timely notice so that they could protect their interests by seizure of the property subject to their privilege and pledge, and failed to do so themselves. They contend that the effect of Knowles’ abandonment of the plantation was to subject everything on the Woodburn plantation in 1894 and early in 1895— cotton,, cotton seed, corn, mules, horses, carts, plows and farming implements — to immediate liability for the entire rent of the plantation up to 1897, and to immediate liability to provisional seizure — that the entire rent which so became due was secured by a privilege and pledge on all these objects on the place, which primed any rights which plaintiff had upon the same. They contend that that firm was without right or authority to apply any portion of the proceeds of the crop of 1894 to their debt so long as any portion of the rent due to them remained unpaid.
Defendants rely on Art. 3167 of the Civil Code, which is to the effect that the creditor is answerable agreeably to the rules which have been established under the title: “Of Conventional Obligations,” “for the loss or decay of the pledge which may happen through his fault,” and upon the obligations between themselves and the plaintiffs, resulting from the special agreement between them which appears in the record, also upon the citation of authorities to be found in the Vol. 18, American and English Encyclopedia of Law, page 682.
*1238 Under their view of the obligations of the plaintiff it was their legal duty at once, upon being informed that -the lessees proposed to-abandon the plantation, not only to notify the lessors, but to provisionally seize everything there was on the place to secure the payment of all the rent notes which had been placed in their hands. They maintain that having placed the notes in the hands of the plaintiff they were themselves either powerless to take out remedial process against their lessees, or that it was not their duty to do so. The fact that the defendants transferred the notes to the plaintiff as collateral did not, in our opinion, withdraw from them the power of protecting their interests by proceedings against the makers of the notes. Notwithstanding the pledge, they were still owners of the notes, as is expressly declared in Art. 3166 of the Civil Code. The article reads as follows: ‘ ‘ Until the debtor be divested from his property (if it is the case) he remains the proprietor of the pledge, which is in the hands of the creditor only as deposit to secure his privilege on it.” Laurent refers to this matter in Sec. 499, in his treatise ‘Du Gage’ (Laurent, Vol. 28), though he states that the exercise of the right of ownership would be hampered by the pledge. He says: ‘ Celui qui donne une créance en gage conserve le droit d’agir contre le débiteur puisqu’il reste propriétaire de la créance (Art. 2079) ; mais ce droit d’agir est entravé par le gage ” Alluding to interests upon the pledged notes he says they should be credited upon the principal debt, the reason assigned being: “ Si le débiteur refusait de payer les interets le demandeur ser ait dans impossibilité de l’y contraindre puisqu’il ne peut pas prouver son droit, le titre de sa créance étant dans les mains du gagiste. II devriat done mettre celuiei en cause aussi souvent qu’l s’agit de reclamer les interets. Le legislateur a pensé qu’il etait plus simple d’autoriser le gagiste a exiger le payment des interets.”
We see no obstacle in the way of the lessor’s having recourse directly to conservatory proceedings to protect his interests. He could legally make all the allegations necessary to that end and procure the necessary proof on the trial. It would not be essentially-necessary for the purpose that he should be in actual possession of the notes.
The pledgee’s rights would not be jeopardized by the fact that the pledged notes should be permitted by the pledgee to be temporarily made use of in a suit brought by the pledgor.
*1239 “ Le gage doit étre reputé avoir toujours été dans la possession des eréanciers gagistes, quoique la grosse ait été momentanément-confiée par le dépositaires, soit aux avoués, soit aux propriétaires-memes de la eréance, pour exercer des poursuites centre le débiteur eédé ou sa caution solidaire, dans l’interet des preteurs.” Bourges, 5 juin, 1852, D. P. 54. 2. 125; Dalloz & Vergé, under Art. 2076, C. N. No. 46.
Article 8170, Civil Code, declares that “if the credit which has been given in pledge becomes due before it is redeemed by the person pawning it, the creditor, by virtue of the transfer which has been made to him, shall be justified in receiving the amount and in taking measures to recover it. When received he must apply it to the payment of the debt due himself and restore the surplus, should there be any, to the person from whom he held it in pledge.”
It will be noticed that the law refers to the “ time when the-pledge became due,” as that at which it is contemplated the right should be exercised of receiving the amount of the credit, and that of taking measures to recover it; also that the language of the article is permissive, not mandatory. The pledgee is not declared to be charged with the active duty Of constantly watching the movements-of the debtor with a view to forestalling or frustrating any attempted fraud on his part. He is not required, as a legal duty, to subject himself to damage by taking out attachments, provisional seizures or injunctions to secure the recovery of notes not yet due, under the penalty of losing recourse against his own debtor upon the claim which he holds against him.
The pledgor is not at liberty to neglect looking after his own interests and to transfer to his pledgee the whole responsibility of supervising them for him. Dalloz & Vergé under Art. 2080, No. 4.
Certain duties do devolve upon the pledgees by reason of the pledge, but they are by no means so broad as the defendants contend for. The creditor is answerable under Art. 3167 for the loss of the pledge which may happen through his fault, but in testing in any particular case whether he has been in fault, the degree of care necessary to be used (when a credit is pledged) in protecting the very thing itself which was pledged must not be confounded with that exacted from him in guarding the obligations themselves of the debtor under the credit. A pledgee may be held bound to see that demand of payment- and notice of protest be given in the case of the *1240 pledgee of negotiable notes, and that the notes be not permitted to prescribe while in his hands, and yet not be called on to have recourse to any of the “ extraordinary remedies ” of the law which carry possible damages with them. Defendants in this case made no demand upon the plaintiff to take action, made no tender of costs, nor offer of indemnity. (Hughes vs. Boyce, 2 An. 805).
Defendants say that plaintiff’s obligations were wider under the special agreement which they entered into with them than they would have been under the law itself. They say plaintiffs expressly bound themselves to collect the notes. We do not agree with the defendants in this position. The agreement must be interpreted in connection with the circumstances under which it was made — the relations of parties and the subject matter they were dealing with. The plaintiffs were creditors of the defendants. Defendants were creditors of Knowles. Plaintiffs were the factors of Knowles. All parties knew that the crops on the Woodburn plantation would go into the possession or under the control of the factors. All parties contemplated that this should be done. The maturity of the rent notes was a short time before that of the mortgage notes. It was under this condition of affairs that plaintiffs undertook “to collect the notes.” What was their obligation under the agreement? In the first place, it was not to collect the note3 before they fell due, but “as they fell due” — in the next place it was not a general obligation to collect the notes, but a special obligation to collect them out of the proceeds of the crop then expected to be in their hands. There was no general obligation assumed to collect in the sense of putting the claims in suit. The possible violation of the contract of lease by Knowles was not in contemplation of any of the parties. Plaintiffs did precisely what they agreed to do. Out of the crops of 1893 and 1894 in their hands they collected the rent notes of those years and applied the amounts collected to the reduction pro tanto of defendants’ mortgage notes.
Defendants charge that Bedford & O’Kelley fraudulently caused Knowles to abandon the plantation; that they knew of his intention to abandon it and failed to notify them of the fact. There is nothing in the evidence going to show any collusion between them and Knowles in respect to his leaving the plantation. It is true that their declining to make further advances to Knowles coupled with the fact that he could not procure them elsewhere led up as its result *1241 to Knowles abandoning the lease, bat they (were under no legal obligation either to Knowles or to the defendants to continue to make him advances, especially in view of the fact of his constantly increasing indebtedness to them. Granting that it was their duty on ascertaining that Knowles intended to give up the lease to notify the defendants, we think that they did so, though there is a conflict in the evidence as to the precise time at which defendants came to a knowledge of the fact. We have not found in the record the date at which Knowles left the place, and we are inclined to the belief that defendants had reason to think, before the 1st of January, 1895, that Knowles, would not be able to continue his planting operations for that year. One of the plaintiffs (Bedford) testifies that he informed one of the defendants some time in the month of December, 1894, of the situation of affairs. Defendants, we think, had time to have taken action themselves in the premises, but they evidently rested under the mistaken idea that they had no duty or responsibility in the matter,' We fail to see any fact on which defendants can rest their complaint that Bedford & O’Kelley, as pledgees, failed to protect the pledge and the rights and interests of the pledgors. We are now dealing with so much of defendants’ complaint as refers to the property removed by Knowles from the plantation. If their defence can be sustained it must be on other grounds than this.
Defendants’ next contention is that the crop of 1894 went into the hands of Bedford & O’Kelley, struck by a privilege in their favor as lessors to secure the payment of the entire rent matured and not matured up to January, 1898; that this privilege primed any right that the factors had upon the same and the latter were without right or authority, either generally in law or under their special agreement to collect the notes, to impute the proceeds of the crop of 1894 to the payment of their own debt.
Our attention has been called by defendants to Arts. 2705 and 3218, and by plaintiffs to Art. 3217, paragraph 8, and Art. 3219 of the Civil Code. The first of these articles is found in the Code under the special heading of “Lease,” the others under the heading of “Privileges,” “Subdivisions,” “Of the Privileges of the Lessor,” and “ Of the Privileges, on Particular Movables.”
They read as follows:
Article 2705: “ The lessor has for the payment of his rent and *1242 other obligations of the lease a right of pledge on the movable effects of the lessee, which are found on the property leased. In the case of predial estates this right embraces everything that serves for the labors of the farm, the furniture of the lessees and the fruits produced during the lease of the land, and in the ease of houses and other offices, it includes the furniture of the lessee and the merchandise obtained in the house or apartment, if it be a store or shop ” * * *.
Article 3218: “ The right which the lessor has over the products of his estate and on the movables which are found on the place leased for his rent is of a higher nature than mere privilege. The latter is only enforced on the price arising from the sale of movables to which it applies. It does not enable the creditor to take or keep the effects themselves specially. The lessor, on the contrary, may take the effects themselves and retain them until he is paid.”
Article 3219: “The privilege of the lessor is enforced on the property subject to it in the manner described in the title: O£ Lease.’ ”
Article 3217: “The debts which are PRIVILEGED on certain-movables are the following:
(i ‡ ¡U *
" 2.*
“ 3. The rents of immovables and the wages of laborers employed in working the same, on the crops of the year, and on the furniture, which is found in the house let, or on the farm, and on everything which serves to the working of the farm.”
Defendants contend that the effect of Knowles’ abandonment of the lease was to cause all the rent notes which he had given, to immediately mature; that being so matured the crop of 1894 (which prior to that fact was struck with the right of pledge conferred in a. general way by Art. 2705 of the Code for the payment of the entire rent) became specially struck and affected with the privilege and pledge provided for in Art. 3217 for the payment of the entire rent-up to the beginning of 1898, as if the lease had been for a single-year and as if the maturity of the rent notes had all been originally fixed for December 1, 1894.
Defendants call our attention to Christy vs. Casanave, 2 N. S. 451; Reynolds vs. Swain, 13 La. 194; Holden vs. Tenner, 6 An. 74; Ledoux vs. Jones, 20 An. 540.
*1243 In the first mentioned case the lessee, Oasanave, daring the lease, notified his lessor that- he intended to leave the premises. The lessor thereupon applied to the court; asking that all the goods, etc., belonging to defendant should be seized, sequestered and sold to pay him the sum of seven hundred dollars, being the amount of rent for the entire lease, which would thereafter become due on the contract, and that he recover judgment for that sum. The judge, on his petition, ordered the sheriff to seize and sell all the goods, etc., or so much thereof as might be sufficient to pay and satisfy the plaintiff the sum of seven hundred dollars due and to become due for house rent. The court on the trial of the ease rendered a judgment in favor of the plaintiff, and defendant appealed, maintaining that, notwithstanding his declaration of intention, plaintiff could: only enforce the contract as made — that is, from month to month. The Supreme Court affirmed the judgment.
In Reynolds vs. Swain, 13 La. 194, plaintiff (a lessor) sued defendant on a lease to recover the sum of fifteen hundred dollars for one year’s rent due and to become due, the lessee having abandoned the premises. The District Court rendered judgment in favor of the plaintiff for fifteen hundred dollars, with leave to take out a general execution or special execution by seizure of the property on the premises, subject to privilege, for the sum of eight hundred and seventy-five dollars, being the amount due the 1st of June, and so on from month to month for the sum of one hundred and twenty-five dollars per month on refusal of defendant to pay the same. On appeal it was contended the case of Christy vs. Oasanave had been decided before the promulgation of the Civil Code and under the operation of the civil laws of the State, and that those laws had been repealed in 1828. The Supreme Court held that the principles settled in that case, making tenants who abandon their lease liable at once for the rent of the whole term, although drawn from the Roman civil laws which had no intrinsic authority here, yet the reason of them had great cogency and was adopted for the elucidation of principles applicable to analogous cases. In the body of the decision affirming the judgment, the court made use of the following language: “When a tenant removes his goods from the premises and abandons them, he withholds from the landlord the pledge he had given for the payment of the rent. It is, therefore, just that he should be permitted immediately to secure himself, if he can, by *1244 seizure of the property removed, or by a personal action against the tenant. The District Judge has provided for the security of the latter by directing that the execution should not issue for more than the amount of the debt actually payable and afterward at the end of every month for the monthly rent, affording him the opportunity of seeking relief if he has any right thereto on account of any rent received by the plaintiff from other tenants.”
Holden vs. Tanner, 6 An. 74, and Ledoux vs. Jones, 20 An. 540, were suits between lessors and parties who had become sureties oif the lessors for the payment of the rent. The court simply held that upon an abandonment of the premises the lessee and his sureties became at once liable to an action for the whole rent. There was no issue in either as to the character and extent of the seizure to be made under the judgments to be obtained, nor as to what the effect this immediate advancing of a right of action had or might have upon the rights of either the parties or third parties relatively to conflicting rights of pledge or privilege upon the products of the land or the different objects upon the property leased. Plaintiffs contend that though Arts. 2705 and 3218, C. C., are general in their terms and extend the right of “ pledge ” to everything on the “farm ” leased, yet so far as the “crops ” on the plantation are concerned and so far as a “privilege” on the crop is concerned the pledge and the privilege extend only to the crop of a particular year for the rent of that year. They argue that it would be unreasonable to suppose that the lawmaker intended to forcedly keep on the different plantations in the State the crops of each year to secure in favor of the lessor the payment of instalments of rent, payable several years ahead; that the business in the State would be greatly hampered by such a rule. That while under the act of 1886 the privilege of the furnisher of supplies is subordinated to that of the lessor, it is only subordinated to the extent of the lessor’s instalment of rent which falls due during the year in which the crop was made. That no person could be found to furnish supplies to a lessee if by an abandonment of the lease by the tenant (over which fact the furnisher of supplies had no control) the lessor should become immediately invested with a right of privilege superior to that of the furnisher of supplies on the crop which he had contributed to raising for the payment of the rent for the period of an entire lease covering several years. They maintain that the generality of the terms of *1245 Arts. 2705 and 3218 of the Civil Code are restrained quoad $he “ crops ” on the plantation and quoad “ privileges” on crops by the provisions of Art. 3217, which limit the “privilege” on the crops, to that of the current year.
If this precise question has ever been submitted to this court before, the decision has escaped our notice. Counsel have referred to no adjudication on the subject.
Articles 2705 and 3218 refer in terms to a right of “ pledge ” and Art. 2317 to a right of “ privilege.” These two rights are distinct, though they resemble each other in their object and some of their results. They both carry with them the power to have the object affected by the same sold and the proceeds of sale applied by preference to the payment of the debt which the rights secured.
Article 3218 refers to the pledge as being of a higher nature than privilege, inasmuch as [the “ right, of the detention ” given by the contract of pledge, while it includes all the benefits of a privilege,, gives rights beyond those of a privilege. That is true, but none the less it is in some respects a more precarious right than is the privilege, for if possession, which is the essential basis of a pledge, be lost, the pledge is lost with its resultant benefits, while a “privilege proper,” which the creditor may consistently and concurrently hold on the same subject, not resting simply on possession, may survive. We think the lessor has a double right, a right of pledge with its right of detention, and included and resulting right of preference and a right of privilege proper; that though he may have lost his right of “ pledge ” by permitting the possession of the object subject to it to escape from his grasp, he can still fall back for security upon his privilege unless that right be also from some cause extinguished.
The right of pledge is intended specially to secure the right of the lessor as between himself and his lessee, though creditors may be held in check and subordinated to the pledgee through the pledge and right of detention; while the “privilege ” is designed specially to fix and determine preferences among creditors. We can assume for the purposes of this litigation that the lessor had a right of “pledge "upon all the fruits produced by the property leased to cover the rent for the entire period of the lease. In the case at bar whatever rights of “ pledge ” defendants may have had in the crop of 1894 they abandoned. That crop went with the consent of de *1246 fendants into the hands of the factor charged with no other duty on part of the latter, under their agreement, than to collect the rent note of 1894 and apply the proceeds of the same to the mortgage note of the same year. This duty they performed. If defendants had any right of “ pledge ” upon the crop in the hands of the factors •or upon its proceeds, they should have exercised that right by seizure in their hands within the time allowed for the seizure of property removed from the plantation leased (C. C. 2709). They made no such seizure themselves (and, as we have seen, plaintiffs were under no obligation to make a seizure); their pledge having been lost (Pickersgill vs. Brown, 7 An. 314), they had to rely upon their privilege. We agree with plaintiffs’ counsel that the lessor’s privilege as a substantive right does not extend beyond the crop of the year for which the rent was due, and that while the abandonment by the lessee of the leased premises may have the effect of advancing the maturity of the instalments of rent so as to hasten his lessor’s remedy, that fact does not have the effect of broadening his rights of privilege against third parties.
We are next to see whether the relations between plaintiffs and defendants, by reason of holding the pledged .notes, were of such a character as to deprive them as regards the latter of the rights which they would otherwise have had over the crop of 1894 and its proceeds. There is no claim on behalf of Knowles that the crop of that year was not properly imputed by his factors to the indebtedness due to them by him(Bloodworth vs. Jacobs, 2 An. 25; Pickersgill vs. Brown, 7 An. 314), and the imputation made must stand unless there be rights intervening which would make such imputation illegal.
We see nothing in the agreement by which plaintiffs, who were mortgage creditors of the defendants and also factors of Knowles, consented to receive possession of the rent notes given by Knowles to the defendants, collect the same as they fell due, and apply the proceeds to the reduction, pro tanto, of defendants’ mortgage notes, ■which would estop them from making available their own rights against Knowles. The transaction was really one more of convenience to the defendants than anything else. When plaintiffs consented to make the collections they did, it certainly was not in the ■contemplation of any of the parties that they should surrender •directly or indirectly, in favor of the defendants, any of their *1247 own rights against Knowles and the crops on which they had a privilege; that they should, .under any circumstances, subordinate their rights to the full extent of those which might thereafter originate in favor of the defendants against Knowles by reason of the latter’s violating his contract. Is it for one moment to be supposed that the plaintiffs would have received the rent notes for collection if accompanied with an understanding, express or implied, that plaintiffs should stand by and take nothing from the crops in payment of their debt until all the rent notes executed by Knowles should be paid? Collaterals furnished to them under such ■conditions would be an intolerable burden instead of a benefit. We think the whole measure of the plaintiffs’ obligations, direct or indirect, were contained in their agreement to collect the rent notes as they fell due out of the proceeds of the crops of the Wood-burn plantation, and to apply them to the reduction, pro tanto, •of defendants’ corresponding note. This obligation they carried out; there their duty ended. We are of opinion that the judgment appealed from is erroneous.
For the reasons herein assigned, it is ordered, adjudged and decreed that the judgment appealed from is hereby annulled, avoided and reversed; and it is now ordered, adjudged and decreed that the plaintiff, John B. O’Kelley, do have judgment against the •defendants, James G. Ferguson and Kimball F. Ferguson, in solido, for the sum of twenty-four hundred and thirty-two dollars and fifty cents, with interest and attorney’s fees, as set forth in their petition, subject to the credits admitted in their petition, and costs in both courts.
It is further ordered, adjudged and decreed that plaintiffs’ rights of mortgage on the property described in their petition, to the extent of the indebtedness sued for, be and they are hereby specially recognized on the said mortgaged property, and the same are hereby made executory, and the said property is ordered to be seized and sold to pay said debt.