DAWKINS, J.
Plaintiff sues the Hibernia Bank & Trust Company and the Julius C. Wolff Company, in solido, as for a tort, for the rental of a certain four-story building located at No. 808 Magazine street in the city of New Orleans. He alleges that on or about February 8, 1908, he entered into a written contract of lease for said premises with a firm known as the J. L. Morrison Company, for a period of five years, beginning on September 30, 1909, at a monthly rental of $125, and for which it executed rent notes accordingly; that said notes were promptly paid until the 1st day of December, 1912; that thereafter nothing was paid on said rent, and he then discovered that said building had been abandoned; that the lessee conducted a business of buying and selling mattings, with other household furnishings, and that some time during the year 1911 said J. L. Morrison & Co. ,was absorbed by the said J. C. Wolff Company, which took over all of its property and assets, including the stock of merchandise in plaintiff’s said building, and on which he had, a lien for the payment of his said rent; that said J. C. Wolff Company later became heavily indebted to the' Hibernia Bank & Trust Company, and. pledged to said bank all of its stock of merchandise; that on the 23d day of February, 1912, said Wolff Company, having become involved financially, advised said bank thereof, and suggested that the goods so pledged to It be removed from the buildings in which they were located, including that of plaintiff, in order that the rent accruing on the unexpired leases on the two buildings, amounting to some $8,400, might not prime its claim as pledgee; that the said bank immediately accepted the suggestion, and that the defendants conspired together for the purpose of depriving petitioner of the security for his said rent, and in furtherance of said conspiracy removed all of the contents of said buildings valued at $20,000, therefrom, and continued to pay him his said rent for a period of nine months until all of said goods had been converted into cash and absorbed by said bank; that this was done for the evident purpose of keeping petitioner in the dark as to the true facts until all of said goods were disposed of, and that thereafter they declined to pay petitioner anything further; that it was then for the first time that petitioner discovered any of the above facts; that his said building was vacant; that said building had continued vacant up to the filing of this suit, and that in view of these circumstances they ‘were due petitioner the full amount under the lease, to wit, the sum of $2,875, with 8 per cent, interest from December 1, 1912, and 10 per cent, attorney’s fees. He prayed for judgment accordingly.
Exception of no cause of action and pleas of prescription of 15 days and one year were filed by the defendants. The exception of no cause of action having been sustained, the case was appealed here, the judgment of the lower court was reversed, the exception overruled, and the case remanded to be proceeded with according to law. Hyman v. Hibernia Bank & Trust Company et al., 139 La. 411, 71 South. 598. The pleas of prescription were referred to the merits.
Defendant bank admits that defendant Wolff Company was heavily indebted unto it, and that it held a pledge on certain of the property in the building 308 Magazine street, but denies any knowledge of the terms of the lease. It further denied the conspiracy charged,, and alleged that it had only sought to collect the sums due it on its pledges; that it had acted in good faith; *1077 that there was other merchandise left in the said building; that no rent was due at the time; and that it was in no wise indebted unto the plaintiff. It prayed that his demands be rejected.
Defendant J. C.,Wolff & Co. filed an answer similar to that of the Hibernia Bank & Trust Company, and on trial of the merits there was judgment for defendants. Plaintiff has appealed, and defendant Hibernia Bank & Trust Company has answered, praying that its pleas of prescription be maintained.
The Facts.
Plaintiff was the owner of a certain four-story building situated at No. 308 Magazine street in the city of New Orleans, and leased the same to a firm by the name of J. L. Morrison & Co., for a period of five years, beginning October 1, 1909, at the price of $1,500 per year, payable at the rate of $125 per month, and for which a written contract of lease was made and recorded, and rent notes to the number of 60 were executed, payable on the first of each month for the rent of the month preceding. The contract stipulated that the failure to pay any one of said notes when due would mature the balance.
The lessee paid the rent promptly, and the lessor went about his business at the New Orleans Cotton Exchange, paying no further attention to the premises, as his notes were deposited in bank and were there taken up by the lessee. Some time during the year 1911, the J. L. Morrison Company was succeeded or absorbed by the J. C. Wolff Company, one of the defendants herein, who continued to conduct the business of wholesale dealers, principally, in mattings imported from Japan and China.
J. C. Wolff & Co. were financed by the Hibernia Bank & Trust Company, which at one time in the course of their dealings became a creditor of the Wolff Company in a sum amounting to some $400,000, for advances, letters of credit, etc., and under an arrangement with said bank the merchandise was shipped to it or in its care,' and certain pledges, the exact nature of which is not disclosed by the record, were executed for its protection. However, notwithstanding said acts of pledge, the merchandise was delivered into the possession of the Wolff Company, some of which was placed in plaintiff’s building and portions elsewhere, and was sold by the Wolff Company in the regular course of business, remittances being made, we assume, as the property was disposed of.
Because of the heavy expense of - doing business, it seems that the business was not profitable, and on February 23, 1912, the secretary of the Wolff Company, a Mr. Otto L. Neugass, addressed to the Hibernia Bank & Trust Company (to whom it was indebted in approximately the sum of $311,000, as above indicated) the following communication, to wit:
“2/23/12.
“Mr. John J. Gannon, President, Hibernia Bank & Trust Company, New Orleans, La.— Dear Sir: I beg to submit the following data relative to the business of Julius C. Wolff Company.
“The pledges as held by the Hibernia Bank & Trust Company, as well as the amount due the Hibernia Bank & Trust Company and all other figures are compiled as per January 31st, with the exception of, that under the head of Letters of Credit and Merchandise, same covers and includes documents that have been received by the Hibernia Bank & Trust Company and drafts accepted in London since January 31st, to date.
Assets as held by the Hibernia Bank & Trust Company against pledges and amounts due under letters o£ credits are as follows:
Accounts receivable.............$106,687 75
Bills receivable.................. 43,097 77
Cash ............................. 27,414 73
Merchandise ..................... 189,313 89 $366,514 14
Amounts due the Hibernia Bank & Trust Company as follows:
Notes ............................$119,200 00
Letters of credit................. 192,059 35 311,259 35
Margin .................................$ 55,254 79
*1079 “Prom past experience, I cannot recommend the continuance of the business, for the expenses necessary to be incurred (expenses reduced according to statement submitted) are such when compared with the profits obtainable that should the business be continued the margin as held by the Hibernia Bank & Trust Company would be depleted, redounding to the benefit of other creditors.
“I respectfully suggest that you take physical possession of your Canal and Magazine Sts. (which merchandise should he able to be sold for cash, or, on short terms, under a force sale in bulk sales at an estimated loss of about 10%). This would deplete the margin of the Hibernia Bank & Trust Company about $5,000.-00, for there is approximately $50,000.00 the property of the Hibernia Bank & Trust Company held in these two stores. The balance of your pledges are covered by warehouse receipts, which you hold, and therefore, are physically in your possession.
“I wish also to advise that the list of merchandise covering goods that are pledged and held in two stores will not agree with the actual merchandise, on hand. These goods that are short are covered by accounts on the books, which accounts should be transferred to the Hibernia Bank & Trust Company. This condition is due to the fact that where a sale was made of merchandise that was not pledged to the Hibernia Bank & Trust Company and included at the same time goods that were pledged, the account was not transferred at the time of the billing of the goods, but when payments were received, Mr. Aitkens referred to said original billing and turned over to the Hibernia Bank & Trust Company a check for an amount equal to the selling price of said goods that had been pledged and termed same as cash sale.
“The reason for suggesting your taking physical possession of or forcing the sale of the merchandise in the stores is that should the firm go into the hands of a receiver before this merchandise is either removed to other quarters or sold and delivered, the unexpired leases on the two buildings aggregating some $8,400.00 would stand as a preferred claim against said merchandise.
“After taking possession of your pledges, the corporation of Julius C. Wolff Company should go into the hands of-a receiver, the remaining assets to be used to liquidate other creditors than your good selves.
“One of the creditors of the Julius C. Wolff Company has entered suit for the amount due them, which suit has been duly answered and proceedings will be stayed for some time to come. Other creditors will, no doubt, enter suit and could be bandied the same way pending the accomplishment of the above.
“After the above has been accomplished, I would suggest that all expenses be stopped in total, with the exception of warehouse charges, which would be necessary due to the mattings being in warehouse; interests, which would be a necessary expense due to the amount owed the Hibernia Bank & Trust Company, and a small additional expense necessary to maintain an office for the collection of the accounts that have been transferred to the Hibernia Bank & Trust Company.
“Merchandise held in warehouse could then be sold by sales in bulk at a loss, which would deplete the margin of the Hibernia Bank & Trust Company, but would bring forth a material amount of cash to liquidate the indebtedness. The expense necessary to accomplish the above sales to be a minimum amount, merchandise as listed with the exception of the goods in store are figured in bond duty necessary to remove saihe from warehouse, will .be approximately $50,000.00. When making gales, this duty is to be outlaid as in the past by the transportation company and hilled against respective shipments as advance charges and deducted from-the invoice accordingly.
“The following credits are still outstanding, and although canceled by the Hibernia Bank & "Trust Company, may have drafts drawn against same for goods in transit.
L/C No. 1548 iavor Seimssen & Co. dated Sept. 22/11...................................£ 455. 0.»
L/C No. 1550 favor Samuel Samuel dated Nov. 16/11................................... 584.18.9
L/C No. 1553 favor Samuel Samuel dated Dee. 1/11..................................... 3,300. 0.0
L/C No. 1546 favor Nosawa & Co. dated Sept. 9/11.................................... 2,292.10.1
L/C No. 1552 favor Nosawa & Co. dated Nov. 16/11.................................... 3,000. 0.0
“When the indebtedness to the Hibernia Bank & Trust Company has been reduced to an amount for exceeding $50,000.00 to $75,000.00, I would then find a purchaser for the pledges in force at said time.
“The records and books have not been brought up to date and it is essential that a bookkeeper be installed at once.
“Respectfully submitted.
“Tours very truly,
“[Signed] Otto Neugass, Secy.-Treas.”
This letter was addressed to Mr. Gannon, president of the defendant bank, and upon its receipt he took the same to his counsel, *1081 Mr. McCloskey, of the firm of McCloskey & Benedict for advice. Thereafter the bank promptly had all of the goods on which it claimed a pledge, and which comprised nearly all of the contents of plaintiff’s building, removed, together with other goods on which similar claims were asserted elsewhere, to the warerooms of the United Warehouse Company in said city. Eater an arrangement .was made with J. C. Wolff, president of the Wolff Company (who had resigned as such about the time the letter above quoted was written) by which he sold the said merchandise on commission, at a discount, for the account of the bank, who, after paying expenses, applied the net proceeds to the payment of its debt.
Unfortunately we are not favored with a clear exposition of the details of how the affairs of the Wolff Company were handled with the bank, the president of the latter professing in large measure ignorance thereof, and referring counsel on cross-examination to his counsel, and the counsel when on the stand exhibited as little or less knowledge than the client. Enough is gathered, however, to establish that after the taking over of the merchandise the Wolff Company continued its account with the bank, but no cheeks were paid without first being approved by some one in the bank, just who is not disclosed. In some way, which is also not explained, most of the other creditors of the Wolff Company were settled with.
From February to December, 1912, plaintiff’s rent was paid, by either the bank or the Wolff Company, on checks against its account approved by the bank (plaintiff’s notes being deposited at his own bank where they were taken up, and he going about his business, as a broker, at the Cotton Exchange, and' giving the matter no further thought), until all of the merchandise was disposed of. Shortly after the first of December, 1912, he was notified by his own bank that the rent note for November, 1912, had not been paid, and he promptly applied to the Wolff Company to know why it had not, and was by it referred to the Hibernia Bank & Trust Company, who in turn referred him to its counsel. As to his interview with counsel, plaintiff says (and is not contradicted) :
“Mr. McCloskey said they had paid out all of the money they could for that concern, that they were trying to save the concern from going into bankruptcy; that they had advanced considerable money to them, and they were trying to protect themselves, and he declined to pay this note.”
Thereafter no action seems to have been taken until the filing of this suit on September 3, 1913. In the meantime, J. C. Wolff, former president, had fallen out with the defendant bank over commissions or other matters which are not altogether clear from the record, and had himself sued the bank. He then proceeded to give the plaintiff and his counsel the benefit of this information about how the property and affairs of the Wolff Company were handled by the bank, together with a copy of the letter -of February 3, 1912, and upon which information this suit was filed.
We think it conclusively established by the record that plaintiff was in entire ignorance of what had taken place, including the absorption by the Wolff Company of J. E. Morrison & Co., until the failure to pay the rent for November on December 1, 1912; that his rent had been promptly paid, and, being absorbed .with his business as a broker at the Cotton Exchange; he gave the matter of the rental of this building no further thought, and that this was known to defendants. It is contended by counsel for the bank that upon receipt of this letter of February 23, 1912, he concluded that the whole concern of J. C. Wolff & Co., were a “rotten or crooked concern,” but the suggestion to remove the merchandise from the building where the bank’s pledge (if it had *1083 one under the circumstances) was primed by plaintiff’s lessor’s lien was adopted, and J. O. Wolff was employed to sell, and did sell, the property so removed at a discount for account of the bank.
[1] It may be that the bank would have pursued the same course as it did had it learned of the condition of the J. O. Wolff Company’s affairs in any other manner, but it is hardly probable that it could have handled the matter in such a manner as was done; that is, removing the merchandise without objection on its debtors’ part, employing its executive officer to sell the same, controlling its bank account, and paying the rent to plaintiff for nine months until the goods were sold. The chances are that it would have had to resort to judicial process, in which it is very doubtful as to whether a pledge could have been sustained under the evidence in this record, and this would have precipitated a clash with all of the creditors, in which plaintiff would no doubt have been apprised of conditions, and could have asserted his superior lien upon the goods. Whether the bank’s action was pimply that of a diligent creditor seeking to protect itself, or whether it was conspiring with the Wolff Company to fraudulently deprive plaintiff of his lien, the effect was the same, and the result was in law a willful violation of the rights of plaintiff, and to that extent a legal fraud.
It is useless to review the law applicable to this ease, which was fully cited and discussed by us on the former appeal from a judgment sustaining the exception of no cause of action. We think the allegations of the petition were fully sustained by the proof, and the law cited, both on the merits and as to the plea of prescription, is entirely applicable.
[2, 3] There is only one other question of law in the case remaining for our determination, and that is as to whether plaintiff is entitled to recover for the full term of his lease.
Article 2705 of the Civil Code provides that the lessor has, for the payment of his rent and the performance of the other obligations of the lease, a lien upon the property of the lessee in his building. .When the lessor sues for his rent, whether due or not due, if he fears that the property on which he has a lien may be removed from the building, he may provisionally seize the same by virtue of his lien. C. P. art. 287. What is the basis of the right to seize for the rent not due? It must undoubtedly be the lien as lessor. In the case of Trager Co. v. Cavaroc Co., Ltd., 123 La. 319, 48 South. 949, a receiver had been appointed for the defendant, and subsequently all of its property had been converted by the receiver to cash, and a final account filed. The account was opposed by several creditors, among whom was the lessor, who alleged that he had leased the premises to the corporation, occupied by the defendant at time of appointing the receiver, for a period of five years beginning March 1, 1907, and that he had a. lien and privilege upon the contents of his building, as well as its proceeds in the hands of the receiver, for the payment of his rent for the entire period. About this time the defendant was adjudicated an involuntary bankrupt, and the receiver appointed trustee, and in that capa'city he appeared in .the receivership proceedings and sought to have the funds of the estate turned over to him as trustee of the bankrupt. The receiver was appointed May 14, 1908, and the petition in bankruptcy was filed July 17, 1908.' The rent notes were paid as they matured up to August 1, 1908, so that at the date of the adjudication there was no rent actually due. In passing upon the matter, this court said:
“Considering whether the fund in question should be transferred, to the trustee of the lessee and the lessor compelled to follow it into the bankruptcy court, we conclude that the les *1085 sor had a lien and right of pledge and detention, to secure the payment of his rent due and to become due, upon the movables found in the leased premises, which lien and right extend to the fund in the hands of the receiver as the proceeds of said movables; that this lien and right is his property, and not that of the lessee, and was not surrendered in bankruptcy by the lessee; that prior to the proceedings in bankruptcy the lessor, in the manner provided by law, was prosecuting, in the state court, his claim against the lessee for rent due and to become due, and was seeking to enforce his lien and right of pledge against said movables, and against the proceeds thereof, then in the custody of the court, through its receiver, and that the bankrupt act does not devest the state court of jurisdiction of the case, or confer upon the trustee of the bankrupt lessee the right to take away the fund affected by the lessor’s lien until his claim has been adjudicated and satisfied therefrom.”
Again it has been held that the abandoning by the lessee of the leased premises has the effect of maturing the whole amount of rent under the lease. Christy v. Casanave, 2 Mart. (N. S.) 451; Reynolds v. Swain, 13 La. 194; Deslix v. Jone, 6 Rob. 295; Roumage v. Blatrier, 11 Rob. 107; Holden v. Tanner, 6 La. Ann. 75; Henderson v. Meyers & Bro., 45 La. Ann. 798, 13 South. 191; O’Kelly v. Ferguson, 49 La. Ann. 1249, 22 South. 783; Am. Machinery & Con. Co. v. Stewart, 115 La. 192, 38 South. 960. That the building No. 308 Magazine street, belonging to plaintiff, and on which he sues for the rent, was practically emptied and abandoned by the J. C. Wolff Company when the goods on which defendant bank claimed a pledge were removed appears from the evidence. The whole of the rent, therefore, became due at that time.
The premises remained vacant and unrented for the remainder of the lease period, or for 23 months, and plaintiff is entitled to recover the full amount of the rent, with interest and attorney’s fees.
For the reasons assigned, it is therefore ordered, adjudged, .and decreed that the judgment appealed from be and the same is hereby annulled and reversed; it is further adjudged and decreed that plaintiff have and recover of the defendants judgment, in solido, for the full sum of $2,875, with 8 per cent, interest on $125 thereof from December 1, 1912, until paid, and a like rate of interest on each of the monthly installments of $125 falling due thereafter, from the dates of their respective maturities until paid, and for the further sum of 10 per cent, upon the amount of principal and interest as attorney’s fees. Defendants to pay the costs of both courts.
See dissenting opinion of O’NIELL, J., 81 South. 722.