PUMILIA v. JOHNSTONE

—

(March 18, 1929. Opinion and Decree.)

—

Frymire and Ramos, of New Orleans, attorneys for plaintiff, appellant.

A. T. Higgins, of New Orleans, attorney for defendant, appellee.

JONES, J. Plaintiff sues for $595.00, seven months' rent of an apartment at No. 4507 S. Derbigny Street, at the rate of $85.00 per month. He attaches to his petition the lease, which was in standard form, beginning January 12, 1925, and ending September 30, 1926, and the seven unpaid rent notes. He alleges that defendant abandoned the premises on February 20, 1926, and that he was actually moving out his furniture when this suit was filed. A writ of provisional seizure was issued, but the furniture, which had been seized by the sheriff, was later bonded.

Defendant answered, admitting the lease, but averring that there had been installed in the building a Go-Ro water heater, which was connected with a flue built in the wall; that on various occasions in November and December, 1925, and in January, 1926, two cooks, a guest, his mother-in-law, his baby and his wife had been made ill by carbon monoxide fumes from the Go-Ro heater; that on each occasion he notified plaintiff through his rent collector; that a representative from the Go-Ro company was called in, who reported the heater in good condition, but that the vent to carry off the gas and smoke was a mere sham, or pretense; that the gas, instead of going through the vent, returned into the kitchen, and, when the windows were closed, any occupant of the

kitchen would be overcome; that this bad vent was due to the faulty construction of the building, and that he had been forced to abandon the apartment by the poisonous fumes.

On May 4th, Calvin Flemming, father-in-law of defendant, intervened, claiming ownership of a part of the seized furniture, but his intervention was dismissed.

After trial there was judgment for defendant, dismissing the suit, and plaintiff has appealed.

Plaintiff offered the lease and rent notes and rested.

Mrs. Johnstone, wife of defendant, testified substantially as follows:

That she was a graduate physician and that in November, 1925, her cook had fainted in the kitchen; at first she thought it was a heart attack and had no idea it was carbon monoxide; that later a new cook was attacked in the same manner and that a visitor had to leave the kitchen because she was made ill; that her niece and mother were also made sick and that on Christmas Day she was made so ill that she had to go to bed after dinner and remain there for a week; that these various illnesses were caused by the carbon monoxide gases issuing from the Go-Ro heater; that this gas was particularly bad when someone turned on a faucet to get hot water; that she had tried to report this defect at the office of Deano, the real estate agent representing plaintiff, but had not been able to find him in and that she had told the rent collector that she would have to move unless the defect was remedied; that at the same time she had complained of several other small defects which had not been improved; that she had the Go-Ro representatives up there two or three times but they did not remedy

the defect; that she could not close the two windows in the kitchen because no one could stay in the room then; that she herself had not been in the apartment frequently during 1925, as she was living in the country, but that the apartment had been occupied from time to time.

Albert Flemming and Steve Wildey, witnesses for defendant, who had made a more or less casual examination, then testified as to the construction of the flue, but over the objection of plaintiff's attorney on the ground that this testimony was not admissible under the answer, which had averred that the flue was bad and not the heater.

We do not find it necessary to analyze the evidence of these witnesses, as the construction of the flue was later thoroughly explained by Goreaux, after a careful inspection. However, we note here that Wildey, later on in the trial, when he was put on the stand in rebuttal, testified that the flue was straight and went to the roof without obstruction, although he had testified differently on his first examination.

Plaintiff testified positively that he had never heard any complaints about the flue or the Go-Ro heater; that the flue could have been easily removed without tearing down the wall.

Pelletier, a witness for plaintiff, testified that the vent had been placed there by Go-Ro himself and that it had nothing to do with the proper supply of oxygen, as it was intended to take away the burnt gases; that he was both an attorney and a building superintendent, and that he had built six of these apartment houses at one time, four of them being in that immediate neighborhood—three on one side of the street and one on the opposite side, in

which he lived; that in these houses all of the vents were constructed in the same way and all connected with Go-Ro heaters in exactly the same way under the instruction of Goreaux; that he had never heard any complaints about them; that he had probably placed, in different buildings, a hundred heaters of this kind, which gave satisfaction.

Goreaux, the inventor and manufacturer of the Go-Ro Water Heater, testified that he had turned out 250 heaters a month for the past eight or nine years and that he had made a thorough inspection of the flue and heater in this apartment with Pellettier and a tinsmith just fifteen days before the trial; that the flue had been installed as he directed; that the entire length of the whole vent structure was five feet and that the vent was amply sufficient to remove the gas fumes, if any; that there was an exactly similar heater downstairs in the lower apartment with the same kind of flue, in good order, giving entire satisfaction; that on the 'day of his inspection he had tested the flue and the heater by burning a newspaper in the heater, as he could not light the gas because some of the pipes in the building had been disconnected and left open; that he found no such stains or discolorations, as usually are left by imperfect work on the part of water heater or flue; that the invention and testing of water heaters, and the burning and combustion of fuel had been his business for the past twenty-five years after he had made a special study of the subject; that $5.00 would cover the cost of putting in a new pipe four feet long, with a couple of elbows; that the kitchen contained two windows and two doors and that he had found the vent perfectly straight, without any obstructions, and that it gave a good draft; that the vent pipe was insulated with asbestos paper; that there was a circular pipe leading off from the water heater up to the wall about five inches in diameter; that this circular pipe goes through the wall into a rectangular 5½ by 2-inch pipe, amply large to carry off all gases and create a strong draft.

On cross-examination he testified as follows:

He was no longer connected with the Go-Ro heater; he had never been a college student, but that he had taken correspondence courses and was familiar with the subject both from a technical and mechanical standpoint; that carbon monoxide gas was lighter than air and would tend to rise to the ceiling instead of settling on the floor; that the flue extended one foot one inch above the top of the roof and the circular pipe leading from the heater projected into the rectangular pipe in the wall substantially a quarter-inch; that the rectangular pipe was 5 by 2¼ inches and it had ample capacity to take off the fumes from this four-gallon heater; that on the day of his inspection he had put his hand inside the flue, had gone on top of the roof and examined every part of the flue except about six inches; that carbon monoxide would have a tendency to discolor the heater and the ceilings and that the flames coming out of the heater would discolor the vent pipes, but he had found no evidences of any such discoloration; that the canopy placed over the gas-stove and heater would aid in carrying away noxious gases and cooking odors, if any were formed and that, in his opinion, no illness would be caused by the heater or by the flue; if all doors and windows were closed and no air admitted in the room the heater would not operate at its best; that it would be like closing the damper on a stove, thus causing some carbon monoxide to be given off; that

the flame in the heater might be a perfect blue flame and still a small percentage of carbon monoxide might be given off, and possibly some carbon dioxide too; that all heaters show about five per cent incomplete combustion. On page 57 he testified in part as follows:

"A. Well, they might have gotten sick from many causes. They may have become overcome by heat; they may have a congestion from the outside but not from carbon monoxide.

"Q. If all of these conditions were there, it would show conclusively that the heater was not working properly.

"A. Not necessarily; it would probably be that the gas was not working properly. If the gas is not connected to a flue, as in a gas stove, the carbon monoxide escapes from an oven and the chances of toxic poison are greater from a gas stove than from a heater with a flue.

"Q. What effect does the high pressure on gases have, with reference to a Go-Ro water heater giving off a greater or a lesser quantity of carbon monoxide?

"A. Well, if the pressure is abnormal, you will have too much gas for the capacity to inspire atmosphere air, and the result would be incomplete combustion and therefore result in carbon monoxide. The chances of high pressure in a heater is very remote.

"Q. And very remote with low pressure also?

"A. That has the opposite effect; it would have too much inspiration for the Bunsen burners. I may say that all through this house there are gas appliances, such as radiators and heaters burning, and all of them has a tendency to take the oxygen out of the air and the whole atmosphere is being deposited with a more or less percentage of carbon monoxide; and, in this case, that may have affected the occupants of that house."

He had spent one and a half hours at the building and that, in his opinion, the vent pipe was adequate and was operating properly, as it was installed in the usual way to prevent any down draft.

Pellettier, the building expert, when recalled to the stand, confirmed Goreaux as to the inspection of the premises and the testing of the heater. He said that once, shortly after defendant moved into the building, he had gone there with him and that defendant had then complained of the narrowness of the driveway and said "he was going to take a sledge hammer and break the damn thing off," but that he had not complained of the heater, or of the flue; that he then noticed that the gas radiator in the sitting room had been removed and that an open gas heater had been substituted; that he had built six apartment houses and that all contained heaters and vents exactly like this one and that they had been installed by the same plumber and the same tinsmith and that there had never been any complaints; that he was living in a similar building just across the street and that he had a tenant for one and a half years in his upstairs apartment, which contained a heater and flue just like this one, but he had never had any complaint.

Giroir, a tinsmith, who testified that he had built twelve such vents, but had heard of no complaints, confirmed Goreaux and Pellettier as to their inspection and said he saw smoke rising out of the roof when the newspaper was burned; that the flue, which was solid metal pipe, could easily be pulled out and another installed at a cost of five or six dollars, as there was ample room in the wall to take out the pipe, the vent or flue being only 2½ by 5 inches, while there was a space inside 8 by 2½ inches; that in order to remove this flue you would simply have to cut off three rivets, remove the cap from the roof, pull out the metal pipe and put in a new one.

Caillouet, the plumber who installed this water heater and ten others, in all these

apartments, confirmed Goreaux, Pellettier and Giroir as to the inspection and testing of the heater. He said that he had installed altogether about two hundred of these heaters and had had no complaints and that a new flue or vent could be put in for six or seven dollars, by running the pipe straight up to the roof.

Plaintiff, when recalled, confirmed the other four as to the inspection.

He said that a new vent could easily be installed by running a new pipe up to the roof and that it would not look quite so well, but would not cost more than five dollars; that he had a telephone at his residence and in his office, but had had no complaint from defendant of any sort.

Douglas Flemming, a witness for defendant, testified on rebuttal that when you turned on the heater the flame roared, and if you stayed in the kitchen you would get sick from the carbon monoxide; that incomplete combustion of any fuel containing carbon always produced carbon monoxide in larger or smaller quantities, depending on the kind of fuel and various other conditions; that he had been present in the house when others were made sick; that the two windows in the kitchen occupied practically all one wall and covered at least twelve square feet; that the kitchen contained a four-burner gas stove and that the windows were always open when people were in the kitchen.

Calvin Flemming, the father-in-law who had claimed a part of the furniture, testified that he had advised his daughter to move because the flue was defective.

Mrs. Alma Flemming testified that she had been taken sick twice in the kitchen while she was helping with the cooking; that once she was made sick in five minutes, although the windows were open and the gas stove was not burning; that at another time she was made sick in ten minutes; that at both times only the small pilot light was burning; that she did not know much about the heater or the flue, as she visited there rarely a few days at a time.

The above analysis of the evidence shows that the defendants, in their attempted proof, go further than the allegations of the answer. In the answer they had stated that whoever happened to be in the kitchen would be overcome by the gas when the windows were closed, but in their testimony they say that these persons were made ill, even with the two windows and the two doors open, and one witness even goes so far as to say that she was made ill while only the pilot light was burning, although defendant's wife had stated that the gas fumes were not bad, except when a hot water faucet was turned on.

It will be further noted that defendant had been leasing the building, at the time they attempted to abandon it, thirteen months and eight days, and that they had never communicated directly with the landlord, although he had a telephone at his office and home.

It seems to us that the testimony of the expert, Goreaux, should be given great weight, as the heater and flue had been installed under his instruction and he had made a thorough inspection and examination of the heater and of the flue itself just before the trial.

His testimony is far more probable than that of the defendant's wife and his other witnesses under all the circumstances. As the heater could easily have been turned off it seems highly improbable that so many people would have been made ill. In a small kitchen with two windows and

two doors open, such a result would be well nigh impossible.

Furthermore, the evidence shows that the kitchen contained a four-burner gas stove, which was used constantly to prepare meals, and some gas might have escaped from that.

We do not find it necessary to pass upon plaintiff's objection to the evidence, or upon the legal points made by him as to insufficiency of notice and notice to unauthorized persons, because a careful examination of the facts convinces us that the defendant has failed to prove his special defense and that the abandonment of the premises when repairs could have been made for so small an amount, was unjustifiable.

The appellate courts of this State have always held that the law does not favor the abrogation of leases. Riccobono vs. Kearney, 7 La. App. 738; Denman & Co. vs. Lopez & Co., 12 La. Ann. 823; Glaser vs. Cahill, 9 La. App. 388; 120 So. 730.

Forfeiture of leases is not encouraged by the Courts and will be enforced only when the right thereto is clear beyond a doubt both of fact and law. Rosenthal vs. Prutsman, No. 1728, unreported Tess. Orl. App. Dig. 103. (See So. Rep. Dig.)

In Hyman vs. Hibernia Bank, 144 La. 1085, 81 So. 718, the Court said:

"Again it has been held that the abandonment by the lessee of the leased premises has the effect of maturing the whole amount of the rent under the lease."

For the above reasons the judgment is reversed and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff Anthony M. Pumilia, and against the defendant, Dr. R. W. Johnstone, in the sum of five hundred and ninety-five dollars ($595.00), with interest at eight per cent (8%) from February 25, 1925, and with ten per cent (10%) attorney's fees on principal and interest, and all costs, and recognition of plaintiff's lien and privilege on the property provisionally seized herein.