United States Court of Appeals,

Fifth Circuit.

No. 91–2752.

VERO GROUP, Plaintiff–Appellee,

v.

ISS–INTERNATIONAL SERVICE SYSTEM, et al., Defendants–Appellants.

Sept. 17, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before JOHNSON, GARWOOD and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this Texas diversity case, Defendants–Appellants International Service System, Inc. A/S (ISS), a Danish corporation, and International Service System, Inc. (ISS–USA), a Delaware corporation of which ISS is the majority shareholder, appeal the jury verdict in favor of Plaintiff–Appellee, The Vero Group (Vero), in its breach of contract action to recover compensation resulting from the acquisition of Mediclean, a United Kingdom (U.K.) business. Concluding that the jury committed no clear error in its factual findings as expressed in answers to jury interrogatories, and that the district court committed no reversible error in holding that (1) the acquisition of Mediclean entitles Vero to compensation under its agreement with ISS and ISS–USA, and (2) recovery of that compensation is not barred under the securities laws of Texas, we affirm.

I.

FACTS AND PROCEEDINGS

ISS is an international holding company with over sixty subsidiaries worldwide. The subsidiary corporations, owned in whole or in part by ISS, are primarily engaged in the business of cleaning and maintaining nonresidential buildings. Two of the ISS subsidiaries are ISS–USA and ISS–England. ISS–England is wholly-owned by ISS and, although not a party to this lawsuit or to the contract that is the subject of this litigation, was involved in the underlying Mediclean acquisition.

Vero is a Texas partnership that specializes in locating companies available for acquisition and introducing them to companies interested in acquisitions, and vice versa.

On November 9, 1988, Vero informed ISS of the possible availability of ADT Maintenance, an American subsidiary of ADT Operations, Inc., which was involved in the cleaning and maintenance business. Two days later ISS and ISS–USA entered into an agreement (the referral agreement) with Vero, pro viding for Vero to be compensated for furnishing "referrals and introductions ... [of] acquisition candidate[s] or target[s]" to ISS. In the referral agreement the parties acknowledged that acquisitions by ISS might take various forms, such as a "[a] leveraged buyout, purchase of stock or assets for cash, notes, or exchange of assets." The referral agreement also provided that Vero was to be compensated only if acquisition of the referred company was consummated. Additionally, the referral agreement stipulated that it would be governed by the substantive law of Texas.

Later in November, Vero met with representatives of ISS–USA and ADT. Vero worked with the parties to complete ISS–USA's acquisition of ADT Maintenance from ADT. When ISS–USA eventually acquired the assets of ADT Maintenance, Vero was paid a fee of $905,000.

During negotiations for the ISS–USA purchase of ADT Maintenance, Vero wrote to ISS–USA setting forth general information about other ADT subsidiaries that ISS might be able to acquire. One of the subsidiaries of ADT mentioned in that letter was Mediclean. Soon after Vero's letter was sent to ISS–USA, the parent, ISS, together with its U.K. subsidiary, ISS–England, contacted Mediclean regarding the possibility of acquiring Mediclean. These contacts led to negotiations which were eventually successful, with ISS acquiring Mediclean through its U.K. subsidiary, ISS–England, by means of a 100% stock purchase.

When Vero learned of that acquisition, it demanded compensation for its referral of Mediclean. ISS refused to pay Vero on the Mediclean acquisition. Vero then sued ISS and

ISS–USA, alleging that (1) Vero had not been paid its full compensation for ISS–USA's acquisition of ADT Maintenance[1]; and (2) ISS and ISS–USA had breached the referral agreement by refusing to pay Vero any compensation in connection with the Mediclean acquisition.

The case was tried to a jury. Basing its findings on the jury's responses to the special verdict form, the district court found that: (1) Vero and ISS had entered into an enforceable agreement; (2) Vero had referred or introduced Mediclean to ISS; (3) under the referral agreement, ISS owed Vero compensation of $550,716 for the Mediclean referral; and (4) ISS also owed Vero out-of-pocket expenses of $2,703 and reasonable attorney fees of $200,000, plus an additional $35,000 in attorney's fees if the case were appealed to this court and lost by appellant, and $10,000 more in attorney's fees if ISS were to appeal to the United States Supreme Court. The di strict court entered judgment accordingly, and ISS timely appealed to this court.

II.

STANDARD OF REVIEW

In reviewing a jury's findings of fact, this court applies the standard set out in *Boeing Co. v. Shipman.*[2] *Boeing* instructs that "a jury verdict will not be overturned unless the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable [jurors] could not arrive at a contrary verdict."[3] On questions of law, however, we review the trial court's determinations *de novo,* owing that court no deference,[4] including when that court sitting in diversity is interpreting state law.[5]

---

[1]The parties stipulated before trial that Vero was owed $18,015 on the acquisition of ADT Maintenance.

[2]111 F.2d 365 (5th Cir.1969).

[3]*LeBoeuf v. K–Mart Corp.,* 888 F.2d 330, 332 (5th Cir.1989).

[4]*Pullman Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

[5]*Salve Regina College v. Russell,* ––– U.S. ––––, ––––, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

III.

ANALYSIS

On appeal, ISS advances five arguments albeit with differing degrees of force. We shall address those contentions seriatum.

A. *The District Court's Denial of Judgment n.o.v.*

ISS argues that the district court erred in not granting ISS's motion for judgment n.o.v. We conclude that ISS cannot prevail on this issue for two reasons, either of which would be sufficient.

1. No inconsistency between Jury Verdict and District Court Judgment.

The Federal Rules of Civil Procedure contemplate the use of a special verdict form in some jury trials. When that procedure is employed, the court may enter judgment based on the jury's responses to such a form.[6] If, without objection, a fact issue is not included on the special verdict form, the parties are deemed to have waived their opportunity to have the jury consider the omitted issue. The court is then free to make its own factual determinations on the omitted issue. Moreover, if the court does not do so expressly, it is presumed to have made all factual findings consistent with and necessary to support the judgment entered.[7]

Generally, a trial court's judgment based on a jury verdict is not subject to challenge for insufficiency of the evidence unless a motion for directed verdict was made before submission of the case to the jury. The judgment may be challenged, however, even in the absence of a directed verdict motion, when there is an inconsistency between the findings of the jury and the judgment of the

---

[6]Fed.R.Civ.P. 49(a).

[7]*REO Indus., Inc. v. Pangaea Resource Corp.,* 800 F.2d 498, 501 (5th Cir.1986); Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2507 (1971 & Supp.1992). We do not speak to the situation in which the matter omitted from the submitted issues relates only to a claim or defense distinct from any to which any of the submitted issues relate.

court.[8]  As ISS failed here to move for a directed verdict before the case was submitted, ISS must show an inconsistency between the jury's special verdict and the district court's judgment in order successfully to demonstrate reversible error in the district court's refusal to grant the motion for judgment n.o.v.

In attempting to demonstrate such an inconsistency, ISS observes that even though the jury made no finding as to the relationship between ISS and ISS–England, the district court entered judgment against ISS and ISS–USA for Vero's compensation based on ISS–England's purchase of all stock in Mediclean.  In doing so in the absence of a specific finding by the jury as to the separate corporate existences and the interrelationship of the various ISS companies, asserts ISS, the court was inconsistent.  We disagree.  In the special verdict, the jury expressly found that Vero referred Mediclean to ISS.  The fact that ISS–England is the entity which eventually took title to all Mediclean stock is undisputed, as is the fact that ISS–England is a wholly-owned subsidiary of ISS;  and support exists for each of these facts in the record.

The argument advanced by ISS ignores this circuit's deemed waiver rule applicable to fact questions not explicitly included in the special verdict form for answer by the jury.[9]  As noted earlier, when such a waiver is deemed to have occurred and no express findings on such omitted questions are made by the trial court, it is presumed to have made all factual findings on such omitted issues necessary to sustain its judgment.[10]  Even though here the district court did not make express findings as to corporate relationships among the several ISS corporations, that court is presumed to have made any findings about those relationships necessary to support its judgment.  As such, the district court presumably found that the nature of the relationships among the various separate ISS entities

---

[8]*See Traders & Gen. Ins. Co. v. Mallitz,* 315 F.2d 171, 175 (5th Cir.1963) (citing *Roberts v. Sawyer,* 252 F.2d 286 (10th Cir.1958)).

[9]*See, e.g., REO Indus.,* 800 F.2d at 500–01.

[10]*Id.* at 501.

was such that they supported—or at least did not prevent—the outcome of the case, given the posture of the litigation—i.e., one contracting party to a "finders" contract suing the other parties to that contract (a Danish parent corporation and its United States subsidiary) for compensation earned on a business acquisition when a third entity (a noncontracting subsidiary of the contracting parent company that is being sued) takes title to the stock of the acquired business.

2. Sufficiency of the Evidence

The second reason that ISS's complaint about denial of its j.n.o.v. motion fails is that in truth it constitutes nothing more than an attack on the sufficiency of the evidence to support a finding that the stock purchase by ISS–England was tantamount to an acquisition of Mediclean by ISS within the contemplation of the referral agreement with Vero. The district court's stated reason was the failure of ISS to move for a directed verdict at the close of Vero's evidence or at the close of its own evidence. Although ISS insists that its counsel moved for a directed verdict, no such motion is reflected in the record. Aside from our conclusion, hereafter explained, that the thrust of ISS's argument mischaracterizes this as an alter ego or veil-piercing case, we find that the trial court did not err in refusing to allow ISS to attack the court's judgment collaterally in the guise of a motion for a j.n.o.v. based on inconsistency with the jury's special verdict. As that motion in reality attacked the jury's verdict on grounds of sufficiency of the evidence rather than inconsistency with the jury verdict, the court was within its right to reject the j.n.o.v. motion of ISS as procedurally unsustainable in the absence of a prior timely motion for a directed verdict.

B. *Asserted Factual Errors of the Trial Court*

ISS asserts two challenges to the findings of fact of the trial court, which were based on the jury verdict: (1) that Vero furnished written referral to ISS concerning Mediclean; and (2) that the quantum of attorney's fees was excessive and unreasonable. Evidence was adduced at trial to substantiate the jury's findings on both issues. To overturn factual findings of a jury, this court must conclude that, considering all the evidence adduced at trial, no reasonable jury could have reached

the same result.[11] Here we find the record contains evidence on the basis of which a reasonable jury could reach the results challenged by ISS, so we do not conclude that the jury's determinations were unreasonable. It follows that the judgment of the district court, reflecting precisely those findings of the jury, is not clearly erroneous.

1. No Written Referral

ISS asserts that it was entitled to have its j.n.o.v. motion granted because "as a matter of law Vero never made a written referral of Mediclean." We disagree first that the issue is a legal one, and second that factually the jury erred. On November 23, 1988, Vero sent a letter to ISS listing and describing companies that it might acquire. Vero asserted that this letter, which on its second page referred to and briefly described Mediclean, constituted a written referral as contemplated in the referral agreement, particularly when read in light of the several preceding discussions in which Vero had mentioned Mediclean to ISS. The jury found that, among other things, the inclusion of Mediclean on the list set forth in the November 23, 1988, letter constituted a referral and entitled Vero to compensation upon consummation of the Mediclean acquisition by ISS. We are not prepared to say that this finding falls outside the bounds of reason.

2. Attorney's Fees

ISS also asserts that the jury's award of $200,000 in attorney's fees was unreasonable.[12] ISS notes that the trial court phase of this case lasted just over two years; that the damages were stipulated; that Vero took only four pre-trial depositions; and that Vero called only two witnesses at trial. Therefore, ISS contends, the fees bear no reasonable relationship to the amount in controversy ($568,000) or to the complexity of the issues as reflected by the amount of preparation time needed by counsel.

---

[11]*See Boeing,* 411 F.2d at 374.

[12]The jury also awarded a prospective fee of $35,000 if the case were to be appealed to this court and an additional $10,000 if the case were appealed to the United States Supreme Court.

Vero presented an expert witness who had reviewed the number of hours Vero's counsel had devoted to the case, and who was familiar with fees usually charged for this type of litigation. This expert considered, among other factors, the fees customarily charged in the Houston area for business litigation of this complexity. He testified that a reasonable charge for this amount of work would be $283,000; the jury awarded $200,000. Again, we are not prepared to say that no reasonable jury could have reached that conclusion. The same is true for the advance determination that Vero should receive a liquidated sum of $35,000 as attorney's fees if ISS and ISS–USA should appeal unsuccessfully, which they have.

C. *Separate Entities: Inapplicability of Alter Ego Analysis*

In complaining that the district court failed to deal with the various corporate and intercompany relationships, ISS begins by reminding us that its wholly-owned U.K. subsidiary, ISS–England, which took title to 100% of the Mediclean stock, is not a party to this lawsuit and was not a party to the referral agreement. As such, asserts ISS, the district court had to have ignored the independent corporate existence of ISS–England in order to hold the contracting corporations (ISS and ISS–USA) liable to Vero for compensation on the Mediclean transaction. ISS further asserts that, under Texas law,[13] the district court erred in allowing Vero to recover at all without proving *actual fraud,* an element essential to prevail in an alter ego case. But as ISS mischaracterizes both the findings and the holding of the district court in this regard, we conclude that this assignment of error is itself erroneous.

The district court did not disregard any corporate entity; it merely recognized that here the parent corporation and sole stockholder, ISS—not the subsidiary or purported alter ego, ISS–England—was the obligor under the referral agreement with Vero. Given that realization, the district court was imminently correct in concluding that ISS, as the obligor, could not duck its

---

[13]*See DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990); *see also Edwards Co. v. Monogram Indus., Inc.,* 730 F.2d 977, 985–87 (5th Cir.1984) (en banc).

responsibility to Vero simply by arranging unilaterally for title to the Mediclean stock to be taken in the name of one of the obligor's many subsidiaries. This is so irrespective of whether such orchestrated taking of title were done in complete good faith and with a valid business purpose.

The facts and relationships of the parties in this case simply do not equate to the corporate veil-piercing paradigm. That model, unlike the instant situation, envisions an economically responsible corporation or individual (the Stockholder) of a shell or essentially valueless entity (the Corporation), inducing a third party to contract with the Corporation even though the performance to be rendered by the third party will inure to the benefit of the Stockholder. In other words, in the true alter ego situation, the parent or shareholder reaps the benefit of the third party's performance but then asserts that it is insulated from liability by the interposition of the judgment-proof corporation as the only party with which the third party has privity of contract.

The corporate and contractual pattern now before us, however, is precisely the reverse. Instead of causing a judgment-proof subsidiary to contract with Vero for its matchmaking services under the referral agreement, ISS itself contracted directly with Vero for those services. Clearly, ISS did not use an alter ego to incur the obligation; rather, ISS itself incurred the obligation, and ISS itself enjoyed the benefits of Vero's performance. Only subsequently—well after Vero performed and ISS accepted that performance—did ISS cause its subsidiary, ISS–England, nominally to take title to the Mediclean stock. And now, with wide-eyed innocence, ISS implores this court to bless that eleventh-hour corporate two-step and relieve ISS of its obligation to pay for Vero's services.

In light of that distinction, the contention of ISS that the theory of "piercing the corporate veil" or "alter ego," coupled with the need to show "actual fraud" pursuant to Texas law in order for Vero to recover, is exposed as nothing more than a smoke screen. What really happened here is that Vero (1) sent an initial letter to entice ISS to contract for Vero's referral services; (2) prepared, submitted and entered into the referral agreement with ISS and ISS–USA; (3) rendered services to

ISS and ISS–USA pursuant to that agreement in connection with the acquisition of ADT Maintenance;  (4) provided additional referral information to ISS, through ISS–USA, regarding Mediclean's potential as an acquisition target for ISS;  (5) was left out of the loop and thus kept in the dark while ISS (a) negotiated with ADT for Mediclean, (b) transferred funds to ISS–England, and (c) had ADT transfer title of its Mediclean stock to ISS–England in exchange for the funds that ISS had transferred there;  and (6) learned of the Mediclean transaction only after it had been completed, demanded compensation but to no avail, and then filed the instant suit against ISS and ISS–USA.

A brief review of the details of step (5) above, i.e., the negotiations, financial arrangements, and consummation of the Mediclean transaction—of which Vero was not aware, much less a participant—eschews the conclusion urged by ISS and demonstrates beyond cavil just which corporation truly "acquired" Mediclean—ISS, not ISS–England.  The record reveals that after it received Vero's referral of Mediclean via ISS–USA, ISS began its own forced march to acquire Mediclean for itself.  Correspondence and conversations occurred directly between officials of ISS and ADT, the owner of Mediclean.  Although the director of ISS–England was involved in the initial verification of ADT's interest in selling Mediclean, Poul Andersen and Waldemar Schmidt, who were ISS executives, conducted all substantive acquisition negotiations directly with Michael Ashcroft and John Jermine, executives of ADT, the parent of Mediclean.  None of the executives of either subsidiary company were involved other than in minor, ministerial roles.  When the time came to pay for Mediclean, the cash was provided by ISS in an unwritten "loan agreement" on which no interest was charged to, and no payments made by, ISS–England.  Even though ISS–England is a separately organized and existing corporation, there is no evidence in the record to refute that ISS not only owns 100% of ISS–England but also controls ISS–England completely, as though it were merely a division. Any lingering doubts about the accuracy of the court's implicit finding that, for purposes of the referral agreement, ISS acquired Mediclean notwithstanding ISS–England's taking of title, vanishes when viewed in the perspective of the details surrounding the acquisition.

When thus analyzed, this case is recognized as the antithesis of an alter ego situation; at best this is a "reverse" alter ego case. Once that becomes apparent, it is equally apparent that Vero has no need to pierce the corporate veil of ISS–England in order to hold ISS liable for the compensation to which Vero became entitled upon the de facto acquisition of Mediclean by ISS. That in turn obviates the requirement under Texas law to show actual fraud. That ISS funneled purchase money for the Mediclean acquisition into the coffers of one of the sixty or so ISS subsidiaries and had that same subsidiary take title to all of ADT's capital stock in Mediclean does not change the characterization of the transaction as an ISS acquisition one jot or tittle.

D. *Does Article 581–34[14] of the Texas Securities Act Bar Vero's Recovery?*

Finding that Vero is contractually entitled to compensation from ISS does not end our inquiry. Vero's ability to recover that compensation in Texas is a more complex issue in light of the language of bar contained in The Securities Act of Texas (TSA).[15] ISS asserts that even if Vero is entitled to be paid, the federal district court, sitting in diversity, erred in allowing Vero to use that forum to collect the compensation. This is so, insists ISS, because the Mediclean acquisition was accomplished through a purchase of stock, and Vero was not a licensed dealer under Texas securities law. ISS argues that for Vero to collect compensation as a finder on the Mediclean stock transaction, Vero would have to have been registered as a securities dealer. When ISS acquired ADT Maintenance after the Vero referral, the transaction took the form of an assets purchase, one of the several means illustratively listed in the referral agreement. ISS concedes that the TSA was not implicated under those circumstances. On the other hand, states ISS, the Mediclean stock purchase, while admittedly just another of the foreseeable acquisition manifestations listed in the referral agreement, directly implicates the TSA. ISS thus contends that because securities rather than assets were purchased in the acquisition of Mediclean, the TSA bars Vero's recovery of compensation.

---

[14]Tex.Civ.Stat.Ann. art. 581–34 (Vernon 1987).

[15]*Id.*

Texas law provides that persons engaging in securities transactions must be registered pursuant to the TSA in order to use the courts of Texas to recover compensation. Article 581–34 of the TSA states:

> No person or company shall bring or maintain any action in the courts of this state for collection of a commission or compensation *for services rendered in the sale or purchase of securities,* as that term is herein defined, without alleging and proving that such person or company was duly licensed under the provisions hereof and the securities so sold were duly registered under the provisions hereof at the time the alleged cause of action arose....[16]

In *Star Supply Co. v. Jones,*[17] a Texas appeals court, interpreting this section of the TSA held that a finder who was not a registered securities dealer could collect his commission for putting companies in contact with each other, even though the transaction was ultimately accomplished by means of a stock transfer. The finder in *Star Supply* had a contract with the company's owners, who were interested in selling, to find a purchaser for the business. Well after the referral was made, the buying and selling parties agreed on the terms and conditions of the acquisition, a principal feature of which was that the acquisition would be consummated through the buyer's purchase from the sellers of one hundred percent of the stock of the company being acquired.[18] The litigation arose when the sellers refused to pay the finder's fee. The sellers attempted to avoid the finder's claim by asserting that, as the finder was not a registered securities dealer, he was barred by the provisions of article 581–34 from collecting a fee.[19]

To determine whether, under Texas securities law, the finder was thus barred by the registration requirement of article 581–34, the *Star Supply* court turned to federal securities

---

[16]*Id.* (emphasis added)

[17]665 S.W.2d 194, 196 (Tex.App.—San Antonio 1984); *see also Rogers v. Ellsworth,* 501 S.W.2d 756 (Tex.App.—Houston 1973).

[18]*Star Supply,* 665 S.W.2d at 195.

[19]*Id.* at 195–96.

decisions.[20] Applying the "economic reality" test of *S.E.C. v. W.J. Howey Co.*,[21] and *United Housing Foundation v. Forman,*[22] the court stated that "transferring the stock of the company was a means of effecting transfer of the corporate entity and merely indicated ownership of the entire business."[23] The court continued, "[b]ecause this was not a sale of securities as contemplated by article 581–34, there was no necessity that [the finder] be licensed as a securities broker."[24]

The "economic reality" test of the *Howey* and *Forman* decisions involved the question whether, between buyers and sellers, different types of "stock" were securities and thus regulated under federal securities law.[25] The *Star Supply* decision, however, focused on the relevant transaction of that case—the one between the finder and its client—and found that the economic reality of that transaction only incidentally involved securities. It clearly held that finders, who are generally not concerned with the structure of the acquisition once they put the parties together, are entitled to collect their compensation even if the acquisition is eventually consummated through a stock transfer and irrespective of the fact that the finders may not be licensed securities dealers.[26]

An earlier case that drew a more distinct line between stockbrokers and finders in the context of dealer registration was *Rogers v. Ellsworth.*[27] In *Ellsworth,* another Texas appellate court dealt

---

[20]*Id.* at 196 (citing *Searsy v. Commercial Trading Corp.,* 560 S.W.2d 637 (Tex.1977)).

[21]328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946).

[22]421 U.S. 837, 847, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975).

[23]*Star Supply,* 665 S.W.2d at 196.

[24]*Id.*

[25]*Id.; see Forman,* 421 U.S. at 844–46, 95 S.Ct. at 2056–57 (deciding that "stock" issued by a housing cooperative as a prerequisites to renting a unit was not a security under the Act); *Howey,* 328 U.S. at 299–301, 66 S.Ct. at 1103–1104 (holding that agreements whereby investors took part in a citrus venture were "securities" under the Act).

[26]*Id.*

[27]501 S.W.2d 756 (Tex.App.—Houston 1973).

with a finder who, like Vero, had facilitated an acquisition of a business by putting a buyer and seller together. As in *Star Supply,* the seller of the business refused to pay the commission, asserting that under article 581–34 the finder could not maintain an action to recover a commission because he was not a properly registered securities dealer. The *Ellsworth* court drew a sharp distinction between finders and stockbrokers, stating that "[a] finder is an intermediary who contracts to find and bring parties together, but he leaves the ultimate transaction to the principals; he is the procuring cause, and his function ceases when the negotiations between the principals begin."[28] The court held that the distinction between licensed securities dealers and finders "has long led courts to hold that a finder is not precluded from recovering his fee by statutes requiring a broker to possess a license."[29] Applying the principles of *Ellsworth* and *Star Supply* to the instant case, we are left with no doubt but that Vero is not required to be a licensed securities dealer to recover compensation for the Mediclean referral.

Undaunted, ISS responds by asserting that, in light of the U.S. Supreme Court's pronouncement in *Landreth Timber Co. v. Landreth,*[30] regarding the continued viability of the economic reality test and the definition of "security," the rule of *Ellsworth* and *Star Supply* has been changed implicitly, and that the Texas courts would now require Vero to be licensed under article 581–34 to recover compensation as a finder, even in a 100% stock acquisition. We disagree.

In *Landreth,* the Supreme Court held that the sale of all of the stock of a company was a securities transaction for purposes of the anti-fraud provisions of the federal securities laws. The case involved a closely-held corporation the owners of which broadly offered the company for sale through a number of brokers. After some discussions and investigations, the buyer group purchased one

---

[28]*Id.* at 757 (citing and discussing the implied recognition of the distinction between finders and stockbrokers in *Hall v. Hard,* 160 Tex. 565, 335 S.W.2d 584 (1960)).

[29]*Id.* (citing *Shaffer v. Beinhorn,* 190 Cal. 569, 213 P. 960 (1923), and *Seckendorff v. Halsey, Stuart & Co.,* 229 A.D. 318, 241 N.Y.S. 300 (1930)).

[30]471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed. 2d 692 (1985).

hundred percent of stock of the company from the owners. When the business did not live up to the expectations of the buyers, they sued the sellers, alleging that the stock had been widely offered without being registered as required by the Securities Act of 1933. The sellers defended the lawsuit with the assertion that, as the transaction transferred the entire company, the "sale of a business" exception applied and registration of the securities was not required. The Supreme Court disagreed, holding that even the sale of stock constituting one hundred percent of the business was subject to the anti-fraud provisions of the Securities Act; that the stock was a "security"; and that the sale of a business doctrine did not apply.[31]

Given those facts, we are not persuaded that the ruling in *Landreth* would cause the Texas Supreme Court to change the rule of *Star Supply* and *Ellsworth* if faced with the finder's fee issue before us. As an anti-fraud case involving wide broker listings, *Landreth* is factually distinguishable from both *Ellsworth* and *Star Supply*. The relevant agreement in the *Landreth* case was the stock purchase agreement between the buying and selling principals; the relevant agreements at issue in *Star Supply* and *Ellsworth*, as in the instant case, were those between a finder and one of the parties to the eventual stock transaction. *Landreth* did not implicate the issue of whether a buyer or seller of a business could properly refuse to pay for the services of an unregistered finder merely because the buying and selling parties elect to employ a stock sale to effect the transfer of the business. Rather, *Landreth* involved whether under the 1933 Act a security had to be registered under federal law to be sold without implicating the anti-fraud provisions of the Act.

In addition to *Landreth's* being factually distinct from *Star Supply, Ellsworth,* and the instant case, the anti-fraud concerns of the 1933 Act, which drove the *Landreth* Court, do not exist in this case. In *Landreth,* the court was concerned with whether the anti-fraud provisions, which were written to protect consumers, should be interpreted broadly enough to apply to sales of one hundred percent of the stock of a going business. The question before the Court was whether the purchaser

---

[31]*Id.* at 696–97, 105 S.Ct. at 2307.

of the stock, regardless of the percentage of the stock in the company at issue, could justifiably " "assume that federal securities laws apply' " to the transaction.[32] This rationale for applying the federal securities laws is meaningless in the context of a buyer or a seller negotiating and contracting with a finder to locate a third party interested in the acquisition of the business or to locate businesses with the potential for acquisition.

In a letter filed pursuant to rule 28(j) of this circuit, ISS cited cases from four state courts that had adopted *Landreth* as controlling state securities law.[33] We are unpersuaded, however, that any of these decisions are relevant to this case. The cases thus cited adopted *Landreth* in situations factually congruent with the *Landreth* circumstances—disputes involving buyers and sellers of large blocs of stocks that represented at least control if not the entire ownership of the businesses. In those disputes as in *Landreth,* the stocks were not registered pursuant to applicable securities laws. None involved broker or finder commissions as does the instant case. Although it is foreseeable that Texas could follow *Landreth* in securities fraud contests between buyers and sellers, we are not persuaded that the Texas courts would allow the results in *Landreth* or any of the cited state court cases to spill over into cases concerned with transactions between a finder and one of the parties to the sale or purchase of a business which merely happens to be structured as a stock sale rather than a sale of assets, an exchange of securities, or the like. If *Landreth* is going to eliminate Texas's application of the "economic realities" rules of *Star Supply* and *Ellsworth,* the courts or legislature of that state will have to say so.

Moreover, in cases such as this, when the claimant's sole function is to make the initial introduction of the buyer and seller, we are satisfied that article 581–34 is not applicable by its own terms. The plain wording of that article clearly requires a nexus between the "services rendered" for

---

[32]*Id.* at 686, 105 S.Ct. at 2302 (quoting *Forman,* 421 U.S. at 851, 95 S.Ct. at 2060).

[33]*See Banton v. Hackney,* 557 So.2d 807, 824 (Ala.1989); *Kovatovich v. Barnett,* 406 N.W.2d 516, 518 (Minn.1987); *Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 535 (Minn.1986); *Barnes v. Sunderman,* 453 N.W.2d 793, 796 (N.D.1990).

which compensation is sought and "the sale or purchase" of the securities in question. Here, the initial introduction of Mediclean to ISS for which Vero seeks compensation is far too attenuated from the eventual stock transaction between Mediclean and ISS through its English subsidiary—a stock transaction of which Vero was wholly unaware—to be deemed services rendered in that sale or purchase of securities.[34]

## IV.

## CONCLUSION

The district court did not commit reversible error in finding ISS and ISS–USA liable to Vero for compensation on the acquisition of Mediclean. The court was not clearly erroneous in finding no significance in the fact that the ISS companies were separate entities. ISS, one of the contracting parties, was properly found to be the acquirer of Mediclean as the direct result of Vero's referral, and thus legally responsible for Vero's finder's fee based on that referral. Neither did the district court err in holding that Vero was not barred from collecting its referral fee by article 581–34 of The Securities Act. And we find no reversible error in the jury's award of $200,000 in attorney's fees for services of Vero's attorneys at trial and an additional $35,000 for their services in ISS's unsuccessful appeal to this court. Therefore, the judgment of the district court is, in its entirety, AFFIRMED.

---

[34]*See Hamilton v. Industrial Equity (Pacific), Ltd.,* No. 91–2325, slip op. at 11–12 (5th Cir., August 21, 1992).