United States Court of Appeals,

Fifth Circuit.

No. 93-3715.

CHRYSLER CREDIT CORPORATION, Plaintiff-Appellee, Cross-Appellant,

v.

WHITNEY NATIONAL BANK, Defendant-Appellant, Cross-Appellee.

May 5, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before GARWOOD, JOLLY and STEWART, Circuit Judges.

STEWART, Circuit Judge:

Whitney National Bank appeals the judgment of the district court finding that it had directly converted and had conspired to convert car sale proceeds belonging to Chrysler Credit Corporation. On cross-appeal, Chrysler Credit Corporation appeals the denial of its motion for attorneys' fees. For the following reasons, the judgment against Whitney National Bank is affirmed and the judgment denying Chrysler Credit Corporation's motion for attorneys' fees is affirmed.

FACTS

This appeal involves a dispute between Chrysler Credit Corporation ("Chrysler Credit") and Whitney National Bank ("Whitney"), the two primary creditors for Toyota of Jefferson, Inc. ("TOJ"), an automobile franchise owned and operated by Ethel and Louis Normand (the "Normands") in Jefferson Parish, Louisiana. TOJ had its general operating account at Whitney. In addition, Whitney made personal loans to the Normands. Chrysler Credit provided floor plan financing for new vehicles sold by TOJ. As the floor plan lender for TOJ, Chrysler Credit loaned the funds TOJ needed to buy cars from its distributor.

Under the floor plan agreement, Chrysler Credit secured these loans with a chattel mortgage over all the cars bought by TOJ. The chattel mortgage provided as follows:

> If the Mortgagor so sells any one or more such chattels, the proceeds of each such sale, and the evidence thereof in whatever form the same may be, shall be the property of the Mortgagee and shall be held in trust by the Mortgagor for the use and benefit of the Mortgagee and the Mortgagor agrees as such trustee to deliver such proceeds and such

evidence of sale immediately upon his or its receipt thereof to the Mortgagee, to be applied by it toward the reduction of the indebtedness secured by this Mortgage.

This chattel mortgage was recorded on March 16, 1989. According to the floor plan agreement, TOJ would deposit its car sale proceeds into its general operating account at Whitney. It would then write a check drawn on the account to Chrysler Credit for the sold cars.

During the eighteen-month period of the floor plan agreement (February 28, 1989 through September 28, 1990), TOJ was constantly overdrawn; at one point, it owed over $1.6 million to Whitney. Whitney established the practice of covering TOJ's checks to Chrysler Credit when there were insufficient funds in the TOJ account. At times, TOJ would not pay Chrysler Credit immediately for the cars as they were sold. Instead, TOJ deposited the proceeds from the car sales into its account with Whitney. Whitney, in turn, set off the accounts in satisfaction of the outstanding loans and overdrafts that Whitney had paid. Finally, on September 27 and 28, 1990, Whitney dishonored two checks that TOJ had written to Chrysler Credit. TOJ filed for bankruptcy the next day. An audit of TOJ's books revealed that it had failed to pay Chrysler Credit for 176 cars worth approximately $2,279,342.

After TOJ filed for bankruptcy, it was discovered that TOJ had been consistently violating the floor plan agreement. TOJ had made out-of-trust sales, *i.e.,* sales of cars where the proceeds were not immediately remitted to the floor plan lender, Chrysler Credit.

Although Chrysler Credit performed random audits whereby it would actually go to the dealership and count the number of cars left on the lot and compare it to the amount of money it had received, personnel at TOJ eventually found a pattern to the audits and were able to conceal some of the out-of-trust sales when confronted with the discrepancies. TOJ would then write a check to Chrysler Credit for the car sales it could not conceal. These checks were overdrafts honored by Whitney.

## TRIAL COURT PROCEEDINGS

On May 6, 1991, Chrysler Credit filed a complaint in the Eastern District of Louisiana asserting multiple causes of action against Whitney. By the time of trial, the claims had been narrowed to conspiracy to defraud, conversion, and conspiracy to commit conversion. A jury trial

was conducted May 17-25, 1992.

Before trial, the district court made several significant rulings. It held that Chrysler Credit had created a valid security interest in the proceeds of the car sales that was effective on March 16, 1989. *Chrysler Credit Corp. v. Whitney National Bank,* 798 F.Supp. 1234, 1237 (E.D.La.1992). It also held that Whitney had a valid contractual pledge of the bank account effective on December 28, 1989. *Id.* at 1238. It then held that, despite the greater chronological priority of its security interest, Chrysler Credit could only trace the proceeds in the commingled account if it could prove that Whitney, in setting off the proceeds against the overdraft loans, had acted outside of the ordinary course of business. *See id.* at 1247.

In a motion to reconsider, Whitney argued that pursuant to La.Rev.Stat. § 6:316, it also held a valid statutory pledge that was effective on March 1, 1989, the first day that TOJ overdrew its account. Whitney argued that its subsequent extensions of credit were retroactively ranked to this date and thus it had chronological priority over any security interest held by Chrysler Credit. The court rejected this contention, holding that in order for extensions of credit to receive retroactive ranking, they must be provided for in a contract. *Chrysler Credit Corp. v. Whitney National Bank,* 824 F.Supp. 587, 593 (E.D.La.1993).

During the middle of trial, the district court made another important ruling. The district court found that Whitney had knowledge of Chrysler Credit's interest in the car sale proceeds.[1] Included

---

[1]Despite Whitney's argument to the contrary at appellate oral argument, Whitney was held to have knowledge of Chrysler Credit's security interest and never contested Chrysler Credit's motion. In its written opposition, Whitney only contested the validity of the security interest and stated that one of Whitney's attorneys believed that Whitney's security interest primed Chrysler Credit's security interest.

At trial, when the district court made its ruling, Whitney did not object. The court specifically asked Chrysler Credit's lawyer, David Culpepper, if he had an objection to the stipulation:

THE COURT: Do you have any objection? I want to do the right thing.

MR. CULPEPPER: I mean, I—

THE COURT: You don't have an objection, do you?

MR. CULPEPPER: I think that it's important that the jury understands that—well,

with the pretrial stipulations read to the jury was the following:

> Whitney had actual knowledge of Chrysler Credit's security interest in the proceeds deposited into the TOJ bank account at Whitney.

> Chrysler Credit's security interest in the proceeds in TOJ's bank account had priority over any right of set-off possessed by Whitney.

At the conclusion of all the evidence, the district court then instructed the jury to that effect.

The jury returned special verdicts finding that Whitney had committed conversion, and that Whitney had conspired to commit conversion and fraud. It also found that Whitney had acted outside of the ordinary course of business. The district court entered judgment on the direct conversion and conspiracy to commit conversion claims, but found that there was not enough evidence to find that Whitney had conspired to defraud Chrysler Credit because Whitney did not have a duty to inform Chrysler Credit about the out-of-trust sales. Chrysler Credit filed a motion for attorneys' fees which was denied. Whitney appeals the judgment of the district court; Chrysler Credit appeals the denial of attorneys' fees.

## STANDARD OF REVIEW

Issues of law are reviewed *de novo. Park v. C.I.R.,* 25 F.3d 1289, 1291 (5th Cir.1994), *cert. denied sub nom., Jones v. C.I.R.,* --- U.S. ----, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994). A jury's findings of facts will not be overturned unless the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive

---

> you can do that. I—what I want is to be able to ask Mr. Andignac whether he ever read their mortgage or not—

> THE COURT: Sure.

In the absence of a contemporaneous objection, the appeal of an alleged error is waived. *See Peveto v. Sears Roebuck & Co.,* 807 F.2d 486, 490 (5th Cir.1987).

In its initial brief, Whitney did not contest the validity of the court's ruling, thus it is waived on appeal even if it had been preserved at trial. *Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir.1993); *see also, Knighten v. C.I.R.,* 702 F.2d 59, 60 (5th Cir.), *cert. denied,* 464 U.S. 897, 104 S.Ct. 249, 78 L.Ed.2d 237 (1983) (forbidding parties from raising issues for the first time in the reply brief). Moreover, Whitney did not submit any jury instructions indicating that it did not have knowledge of the security agreement; thus this error is waived on appeal. *Transoil (Jersey) Ltd. v. Belcher Oil Co.,* 950 F.2d 1115, 1120 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 90, 121 L.Ed.2d 53 (1992); *Abel v. Miller,* 824 F.2d 1522, 1535 (7th Cir.1987).

at a contrary verdict. *Vero Group v. ISS-International Service System,* 971 F.2d 1178, 1181 (5th Cir.1992).

## DISCUSSION

### I. CHALLENGES TO THE VERDICT

Whitney contends that the district court erred in finding that there was sufficient evidence for a jury to find that it had conspired with TOJ to commit conversion or that it had committed direct conversion. Because it is stipulated that TOJ converted the car sale proceeds, we need not consider whether Whitney is also liable for conversion. Instead, we must uphold the jury verdict, *in toto,* if we find that the evidence is sufficient to support its determination that Whitney conspired with TOJ to convert the proceeds.

Under La.Civ.Code art. 2324:[2]

> He who conspires with another person to commit an intentional or willful act is answerable, in solido with that person for the damage caused by such act.

The unlawful act is tortious conduct. *Cust v. Item Co.,* 200 La. 515, 8 So.2d 361 (1942), *ovr'd in part, 9 to 5 Fashions Inc. v. Spurney,* 538 So.2d 228 (La.1989). The action is for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged the performance of those acts. *National Union Fire Ins. Co. v. Spillars,* 552 So.2d 627, 634 (La.Ct.App.1989), *writ denied,* 556 So.2d 61 (La.1990). The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. *Id.* This assistance or encouragement must be of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy. *See*

---

[2]Before the 1987 amendments, La.Civ.Code art. 2324 read as follows:

> He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable *in solido* with that person, for damage caused by the act.

Although the 1987 amendments changed the language of La.Civ.Code art. 2324(A), the pre-amendment conspiracies still provide guidance as to the applicable law in regards to conspiracies. *National Union Fire Ins. Co. v. Spillars,* 552 So.2d 627, 634 (La.Ct.App.1989), *writ denied,* 556 So.2d 61 (La.1990) (stating that the 1987 amendment to art. 2324 "rephrased it in terms of conspiracy, conformably to prior jurisprudence").

*Silver v. Nelson,* 610 F.Supp. 505, 517 (E.D.La.1985).

In this case, the unlawful act is conversion. Conversion is defined as an act in derogation of the plaintiff's possessory rights or any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently, or for an indefinite time. *Chrysler Credit Corporation v. Perry Chrysler Plymouth,* 783 F.2d 480, 484 (5th Cir.1986). It was stipulated that TOJ and Louis Normand converted the proceeds of TOJ's new car sales. The jury returned a verdict that, by a preponderance of the evidence, Whitney conspired with TOJ to convert the proceeds of TOJ's new car sales. If the evidence is sufficient to support a jury inference of an underlying agreement and that Whitney assisted or encouraged TOJ to commit conversion, then we must uphold the verdict against Whitney.

The district court's civil conspiracy jury instructions provided a blueprint for the jury's analysis of the voluminous evidence adduced at trial. The district court instructed the jury that:

> Chrysler Credit must prove that Whitney's acts were committed pursuant to a mutual agreement between Whitney and Toyota of Jefferson or Louis Normand to act together to the detriment of Chrysler Credit.

The district court also instructed the jury that the evidence must establish that "Whitney did not merely inadvertently assist tortious activity by Toyota," but instead that "Whitney was aware of its role and knew that it was furthering a tortious scheme." The district court told the jury that although "it cannot be said that the honoring of Toyota of Jefferson's checks was, by itself, a representation to Chrysler Credit that Toyota of Jefferson had sufficient assets to cover the checks, *the honoring of insufficient funds checks, if performed to enable Toyota ... to convert Chrysler Credit's collateral, constitutes an act in furtherance of the conspiracy.*" (Emphasis added.)

At trial, Brent Smith, an office manager at TOJ, testified that Whitney would setoff the car sale proceeds to satisfy the overdraft loans. Smith testified that over the eighteen months of the floor plan he spoke with David Andignac, the Whitney vice president in charge of TOJ's account, almost every day, sometimes four to five times a day, and that they discussed how the overdraft loans were to be paid. He also testified that he was constantly giving Andignac and his assistant, Jean Hill, information about accounts receivables and other anticipated income.

Smith testified that the need for deposits became so desperate at one point that employees at TOJ would deposit receipts after hours:

Q What do you mean you "went down to the bank at 4:30, five o'clock."

A We brought our deposit after the bank was closed between like four and five o'clock.

Q How did you do that?

A Well, that's what they instructed us to do.  That way, we'd get credit that day instead of waiting till the next day to get credit.

Q Who instructed you to do that?

A David Andignac.

Smith stated that the Normands owed approximately $7 million worth of loans to Whitney on their personal real estate loans and that Andignac stated that TOJ was the "work horse" of all the loans.  At some point in early 1990, Smith said that Andignac told him that the bank would not honor any more overdrafts, but Whitney continued paying them as they occurred until September 1990.

Smith also testified that he told Andignac that TOJ was making out-of-trust sales:

A He—what happened was, say, example, if the receivable and the missing deal[3] report totaled $700,000 and we were overdrawn $900,000, it showed that we couldn't cover the overdraft in the bank.

Q Based on the receivables of the company?

A Right.

Q Did Mr. Andignac ever notice that?

A Yes, one time.

Q And what did he say?

A He called me to ask me why and like I told him, I said, "Well we're out of trust."

Q What did Mr. Andignac say when you said that?

A Like very abruptly, "Good-bye," and, hung up.

Smith stated on several occasions that he told Jean Hill that TOJ was making out-of-trust sales.

---

[3]A deal, as explained at trial, is a cluster of paperwork needed to sell a car.  These deals indicated the number of cars sold and the expected receivables.

Smith testified that employees at TOJ, including himself, altered financial records and recalled cars from customers to be put back on the lot with removed license plate tags to fool Chrysler Credit's auditors. He testified further, however, that Whitney knew nothing of these attempts by TOJ to deceive Chrysler Credit's auditors.

A letter that Smith sent to Whitney on July 24, 1990, two months before the dealership filed for bankruptcy, was also introduced at trial. This letter states in pertinent part:

> We all here are working to collect the money as fast as we can. We are giving 150% to keep this business open so we can reduce the debt to the Whitney Bank. If you would bounce a check *then it would be all over with Chrysler Credit* and we worked so hard to keep us going through bad times in this city. [Emphasis ours.]

Whitney's Chairman and CEO, William L. Marks, testified that he thought that the letter was talking about out-of-trust sales.

Daniel V. Dooley, an accounting expert[4] hired by Chrysler Credit to trace the funds, explained how floor plan lending was supposed to work under TOJ's and Chrysler Credit's floor plan agreement. Using schematic charts,[5] he showed how TOJ was supposed to pay Chrysler Credit with proceeds of car sales deposited at Whitney. He stated that, in actuality, TOJ paid Chrysler Credit from an empty account and that Whitney honored the checks written on this empty account. Whitney would then setoff any proceeds. In effect, TOJ was paying Chrysler Credit with overdraft loans. He then explained why this arrangement was so dangerous:

> [W]hat happens if Whitney at any point stops funding the overdrafts. If the overdrafts are not honored at any point in time, the proceeds stop here (indicating). They come to rest in the Whitney National Bank account and they never get any farther along in the process. They don't get up to Chrysler Credit.

He also testified that the danger that he had envisioned had come to pass:

> The situation in 1990, in August and coming to a conclusion in September, was that

---

[4]Dooley, at the time of trial, was an accountant with Price Waterhouse in New York. He had extensive experience in floor plan financing including "accounting for floor plan loans and tracing the proceeds from floor plan inventory, sales and analysis of floor plan transactions." He had served as a court appointed investigator into floor plan fraud and as an auditor for various floor plan financiers. Dooley was accepted by the district court as an expert in floor plan financing and lending practices.

[5]See the three pages following page 5 of the appellee's brief. These charts were prepared by Dooley and provide a useful outline of the floor plan agreement.

Whitney eventually stopped funding the overdrafts and when they did, this is like a pipeline. The last cars sold in the pipeline, which we calculated to be 176, the proceeds never came out the other end of the pipeline to Chrysler Credit. They sort of came to rest—they didn't sort of, they came to rest in the Whitney National Bank's account or the Toyota of Jefferson account at the Whitney and they had the effect of relieving or repaying Whitney National Bank's overdraft exposure.

Dooley also testified that Whitney setoff $1,558,916.73 of the car sale proceeds. He stated that Whitney earned $1.7 million in interest and fees from the overdrafts and loans to TOJ and the Normands. Dooley also testified that Whitney transformed some of the overdrafts with TOJ into secured lo ans with the Normands, which had the beneficial effect of reducing Whitney's total exposure if TOJ defaulted.

Dooley also stated that some of the collateral securing the Normands' loans was real estate and that this real estate was overvalued. He opined that Whitney would have faced a substantial loss if they had foreclosed on the Normands. He also opined that:

By not foreclosing on the Normand interests, by not stopping the overdraft lending situation, by keeping the Normand-Toyota of Jefferson entities alive, at least one event that was positive to the Whitney was that an additional, per [the Whitney accountant] estimates, $1.8 million of collateral was pledged to the Whitney National Bank, helping alleviate, possibly eliminate, what [the Whitney accountant] at least projected as possible loss from the Normand loans....

Al Sinclair, Chrysler Credit's banking expert,[6] testified that based on his review of the depositions of bank officers and the written report, Whitney's relationship with TOJ and the Normands was beyond the boundaries of normal and ordinary banking practices. He cited, as examples, the large amount and frequency of the overdrafts. He referred to them as the "mother of all overdrafts." He also cited the lack of relevant banking records as evidence of out-of-the-ordinary business practices.[7]

Sinclair also testified that, based on the amount of the overdrafts and the financial statements

---

[6]At the time of trial, Sinclair had thirty years of experience working as a commercial banker during which he gained experience making and supervising floor plan loans. He had a graduate degree in banking, had served as president of banks in Tennessee, and was an officer and director of a bank in Florida. He had lectured extensively on commercial lending topics, had published several articles on banking, and had qualified previously as a banking expert.

[7]The information that Sinclair referred to included the reports of loan a committee that had reviewed the extension of credit to TOJ, the lack of any receivable logs and notes that Brent Smith had sent to Whitney, and the absence of loan documentation besides a loan ledger.

submitted by TOJ, any experienced banker such as Andignac would "have recognized that it was a sales out of trust situation and that a banker with that knowledge would have realized he was assisting in the perpetration of a sales out-of-trust situation."

David Andignac testified that he was involved in discussions with TOJ management on how the overdrafts were to be repaid. Andignac testified that he met several times with officials from TOJ to "workout" a way of handling the chronic overdrafts. These meetings included discussions of how TOJ was going to pay back the overdrafts. He testified that he did not want TOJ to go out of business since it was the principal means of servicing both the Norman's and TOJ's debts to Whitney.

Andignac also testified that he never knew that TOJ was making out-of-trust sales to TOJ. He testified that he thought that the overdrafts were caused by an administration bottleneck in which TOJ had to pay Chrysler Credit for the cars it sold before it received payment for them. He also testified that he was familiar with floor plan financing and the term, out-of-trust sales. Andignac also testified that the reason that the overdrafts went on so long and were so large is that he was trying to "workout" the cash flow problems that he believed that TOJ was experiencing.

Jean Hill testified, through deposition, that Smith had told her that TOJ was making out-of-trust sales. She also testified that she periodically called TOJ to see how much it was going to deposit in order to cover overdrafts. She stated that she knew that the source of the deposit would come from the operation of the car business. She testified further that she could not remember any other customers of Andignac who had as large and as frequent overdrafts as TOJ.

Dr. William Staats, Whitney's banking expert,[8] testified that Whitney acted consistently with normal and usual banking practices. He stated that Andignac did what needed to be done to provide credit needed by a business firm and to maintain a workout situation with respect to the loans to the Normands and TOJ. He also testified that whether a particular loan was prudent or not depended on the circumstances and that under the circumstances that existed at the time of the overdrafts,

---

[8]Dr. Staats was, at the time of trial, a professor at the Graduate School of Banking of the South. He was also on the faculty of the Institute for Bank Administration. He held an undergraduate degree in accounting, a masters of business administration, and a doctorate. He had also served on the Federal Reserve Bank of Philadelphia. He had also helped organize a bank and had written several books on banking.

Andignac's actions were prudent.

The district court instructed the jurors that as a matter of law, Chrysler Credit had a security interest in the car sale proceeds that was superior to Whitney's right to setoff the proceeds against the obligation owed by TOJ.[9] The district court also told the jury that the security interest could form the basis of a conversion claim.

Based on the evidence, we find that a reasonable juror could conclude that Whitney had conspired with TOJ to commit conversion. A reasonable jury could conclude that Chrysler Credit proved by a preponderance of the evidence that Whitney conspired with TOJ to detrimentally use proceeds which rightfully belonged to Chrysler Credit. In essence, Whitney assisted or encouraged TOJ to commit a tortious act of conversion. The critical element in this case was the court's instruction to the jury that Whitney knew of Chrysler Credit's security interest in the car sale proceeds. That knowledge, combined with Whitney's actions to setoff the car sale proceeds to the detriment of the normal floor plan financing procedure, and Whitney's support of TOJ's varied expenditures provided an ample basis for a reasonable juror to infer an underlying agreement between Whitney and TOJ to convert Chrysler Credit's funds.

The "workhorse" for all the loans to TOJ and the Normands was TOJ. Whitney and TOJ had a close relationship in which Whitney was fairly well informed about the details of TOJ's financial affairs. It knew that TOJ financed its cars on the floor plan through Chrysler Credit and that Chrysler Credit and TOJ had an agreement pursuant to which the proceeds from the sales of these financed cars were held for Chrysler Credit by TOJ. Whitney and TOJ knew that if Chrysler Credit was not paid and paid promptly, or if a check by TOJ to Chrysler Credit in payment of these proceeds ever bounced, Chrysler Credit would cancel its floor plan agreement with TOJ and TOJ would not be able to finance its automobile sales. As a result, a defunct TOJ would be forced to go out of business leaving Whitney with no means or hope of being paid, in full or in part, the indebtedness that the

---

[9]Both of these conclusions were the result of the district court's pre-trial rulings discussed above. *See generally, Chrysler Credit Corp. v. Whitney National Bank,* 798 F.Supp. 1234, 1244 (E.D.La.1992); *Chrysler Credit Corp. v. Whitney National Bank,* 824 F.Supp. 587, 593 (E.D.La.1993).

Normands and TOJ owed to it.

A conspiracy thus was formed between TOJ and Whitney that allowed TOJ to effectively use the proceeds from the sales of these automobiles for purposes other than to pay Chrysler Credit. In other words, the conspiracy to convert the car sale proceeds involved (1) TOJ, with Whitney's full knowledge, utilizing the car sale proceeds to pay for various expenses of TOJ and the Normands, and (2) Whitney covering all of TOJ's insufficient fund checks to Chrysler Credit in order to avoid cancellation of the TOJ/Contract.

## II. CHALLENGES TO THE JUDGMENT

Whitney contends that the district court made several errors of law in its pre-trial rulings. Chrysler Credit contends that Whitney did not object to the jury instructions and thus failed to preserve for appeal a review of the alleged erroneous instructions based on the district court's pretrial rulings. However, even assuming that Whitney adequately raised objections to the jury charges and to various pretrial rulings of the court which were reflected in the jury charges, Whitney's arguments are still without merit. Upon careful review of the several challenges to the judgment which were premised on the nuances of the Louisiana Civil Code, its ancillaries, and Louisiana Banking Law, Whitney has failed to persuade us that the district court committed error. We thus summarily reject Whitney's legal challenges to the district court judgment.

## III. DAMAGES

Whitney contends that even if it committed conversion or conspired to convert, it is liable only for the amount of the car sale proceeds it setoff, $1,558,916.73, and not for the unpaid amount of all 176 cars for which it was held liable, $2,279,392.51. Under La.Civ.Code art. 2324, a party who conspires with another is liable *in solido* for the damages caused by the acts committed pursuant to the conspiracy. Part of the damages caused by Whitney's conspiracy with TOJ was the diversion of the car sale proceeds of all 176 cars, and not just those amounts setoff by Whitney. Whitney is therefore liable *in solido* for the entire $2,279,392.52. We find this contention to be without merit.

## IV. ATTORNEYS' FEES CLAIM

Chrysler Credit contends that it is entitled to attorneys' fees. Under Louisiana law, attorneys'

fees cannot be recovered unless authorized by law or contract. *Rivnor Properties v. O'Donnell,* 633 So.2d 735, 748 (La.App.Ct.1994). Chrysler Credit has cited no statutory basis for attorneys' fees. It cites *Hyman v. Hibernia Bank & Trust Co.,* 81 So. 718 (1919), as support for its contention that coconspirators who as a part of a conspiracy breach a contract are liable for the attorneys' fees if they are provided for in the contract.

In *Hyman,* the Supreme Court awarded attorneys' fees to a plaintiff who had sued two defendants for conspiring to violate the plaintiff's lease. Only one of the defendants had been a party to the lease. A close reading of this case reveals that there is no clear legal basis for the court's award of attorneys' fees. The award of attorneys' fees was only mentioned in the last paragraph of the majority opinion and was made without explanation. We hold that *Hyman* does not provide a sufficient legal basis for the recovery of attorneys' fees.

V. MOTIONS

Whitney has filed a motion to certify a question to the Louisiana Supreme Court. We deny this motion as unnecessary.

Chrysler Credit has filed a motion to strike portions of Whitney's reply brief because the brief allegedly raised new contentions and issues. We deny this motion as moot.

## CONCLUSION

Because sufficient evidence in the record exists to find that Whitney had conspired with TOJ to convert sales proceeds belonging to Chrysler Credit, the district court judgment is AFFIRMED. The district court judgment denying Chrysler's Credit's motion for attorneys' fees is AFFIRMED. The motions filed by Whitney and Chrysler Credit are DENIED.

GARWOOD, Circuit Judge, dissenting in part:

I respectfully dissent from the holding that Whitney is liable for the total $2,279,392.51 in out-of-trust sales by TOJ.